**FILED**

NOV 1 3 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

YOLANDA C. GIBSON-MICHAELS )
2210 Anvil Lane )
Temple Hills, Maryland 20748 )
(301) 630-5062 )
)
    Plaintiff, )
)
    v. )    Civil Action No._____
)
)
Douglas R. Fahey )    CASE NUMBER 1:06CV01933
3716 Dalebrook Drive )
Dumfries, Virginia 22015-1804 )    JUDGE: Ricardo M. Urbina
(703) 583-7528 )
)    DECK TYPE: Civil Rights (non-employment)
    And )
)    DATE STAMP: 11/13/2006
Jenekia J. Johnson )
1414 Colony Road )
Oxon Hill, Maryland 20748 )
301-567-3040 )
    Defendants )

## COMPLAINT OF NEGLIGENCE, DEFAMATION OF CHARACTER
## UNAUTHORIZED INTERCEPTION OF ORAL COMMUNICATIONS

### I.    INTRODUCTION

    Now comes Yolanda C. Gibson-Michaels, Plaintiff (Prose) and brings this claim

of negligence against named Defendant(s) Douglas R. Fahey former unlicensed contractor with

**SECURIGUARD INCORPORATION**, 6858 Old Dominion Drive – Suite 307 McLean,

Virginia 22101 and Jenekia J. Johnson, 25-year old intern formerly employed by the Federal

Deposit Insurance Corporation (FDIC) residing at 1414 Colony Road, Oxon Hill, Maryland

20748.

RECEIVED

OCT 11 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**II.     Jurisdiction and Venue**

This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to Electronic Communication Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848 , Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. III, §§ 801–804, 82 Stat. 211, 9-7.100 Authorization of Applications for Wire, Oral, and Electronic Interception Orders.

**Federal Trade Commission Act (FTCA) § 618. Jurisdiction of courts; limitation of actions** [15 U.S.C. § 1681p] An action to enforce any liability created under this title may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs.

**III.     PARTIES**

Plaintiff, Yolanda C. Gibson-Michaels, is a citizen of the United States and is a resident of Prince Georges County (P.G) Maryland, residing at 2210 Anvil Lane, Temple Hills, Maryland 20748. Involuntary separated on January 21, 2005 and March 31, 2006.

The Federal Deposit Insurance Corporation (FDIC) relied upon 3rd party evidence unlawfully collected, used, and relied upon by Jenekia Johnson and Douglas R. Fahey (Acting Under the Color of Law) on April 14-15, 2004, relied upon on January 21, 2005 and March 31, 2006 in violation of 18 U.S.C. – 119,  The Privacy Act, 5 U.S.C. § 552a

The Defendants violated Plaintiff's rights and intentionally engaged into voluminous 18 U.S.C. procedures, guidelines, rules and regulations which are beyond the scope of the rule of law and <u>Harmful procedural errors</u>. Plaintiff is seeking civil penalties assessed against Defendant's in violation of the following 18 U.S.C. provisions.

(1) 18 U.S.C. §287 - <u>**False, Fictitious or Fraudulent Claims**</u>

(2) <u>18 U.S.C. § 1001</u> -<u>False Statements or Entries,</u>

(3) <u>18 U.S.C. §242</u> - <u>**Acting Under the Color of Law,**</u>

(4) <u>18 U.S.C. § 247</u> - <u>**obstruction of persons in the free exercise of religious beliefs**</u>

(5) <u>18 U.S.C.</u> §208 - <u>Acts affecting a personal financial interest</u>

(6) <u>**18 U.S.C. § 2511- Interception and disclosure of wire, oral, or electronic communications,**</u>

(7) <u>**18 U.S.C. § 402 - Contempt constituting crimes**</u>

(8) 18 U.S.C. § 912 - Officer or employee of the United States 8 U.S.C. 1324(a)(1)(A)(iv)(b)(iii) - Federal Immigration and Nationality Act

(9) <u>12 C.F.R. Part 366,</u> Minimum Standards of Integrity and Fitness for an FDIC Contractor (Contractor Conflicts of Interest)

(10) 18 U.S.C. §247, 18 U.S.C. § 1030(a)(2) - Federal Trade Commission Act (FTCA)

(11) 18 U.S.C. §1028 - Identity Theft Fraud and Related Activities (appellant victim of bio metric theft (voice print on tape))

(12) 18 U.S.C - 241 Conspiracy Against Rights

(13) 18 U.S.C. 242 Deprivation Of Rights Under Color Of Law

(14) 18 U.S.C. 245 Federally Protected Activities

(15) 18 U.S.C 246 - Deprivation Of Relief Benefits

(16) 18 U.S.C 2701 through 2703 - Stored Wire and Electronic Transactional Records

Douglas Fahey contractor employed by Securiguard and USEC Corporation with the use of a Sony tape recorder (interception of oral communications) placed a Sony tape recorder inside the purse of Jenekia Johnson to intentionally intercept my oral communications without a court order because I quoted a Bible verse inside a closed door office.

Douglas R. Fahey an unlicensed contract employee acting under the color of law, used evidence derived from the use of the Sony Tape recorder in his development of an unauthorized investigative report, records, investigative interview, copies of the tape recording, storage, release, transmittal. As a result of Douglas R. Fahey and Jenekia J. Johnson's unlawful interception of my oral communications without a court order, reason, or authority; I am now a victim of Bio-metric Identity theft, deprived of income, benefits, and suffered egregious defamation of my former outstanding character as a former employee at the Federal Deposit Insurance Corporation (FDIC).

**Statutes**

18 U.S.C. § 2511(1)(a) (2000)

18 U.S.C. § 2518(1)(c) (2000)

18 U.S.C.A. § 2510(17) (West 2000 & Supp. 2004)

18 U.S.C.A. § 2701 (West 2000 & Supp. 2004)

18 U.S.C.A. § 2703(a) (West 2000 & Supp. 2004)

Electronic Communication Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. III, §§ 801–804, 82 Stat. 211

9-7.100 Authorization of Applications for Wire, Oral, and Electronic Interception Orders

**Fourth Amendment** to the United States Constitution. *See, e.g., Katz v. United States*, 389 U.S. 347 (1967). **§ 619. Obtaining information under false pretenses** [15 U.S.C. § 1681q]

Any person who knowingly and willfully obtains information on a consumer from a

consumer reporting agency under false pretenses shall be fined under title 18, United States Code, imprisoned for not more than 2 years, or both.

**§ 620. Unauthorized disclosures by officers or employees** [15 U.S.C. § 1681r]

Any officer or employee of a consumer reporting agency who knowingly and willfully provides information concerning an individual from the agency's files to a person not authorized to receive that information shall be fined under title 18, United States Code, imprisoned for not more than 2 years, or both.

IV.    **SUMMARY OF ARGUMENT**

Under the FTCA, the United States is liable for its tortuous conduct in the same manner and to the same extent as a private individual under like circumstances in that jurisdiction would be liable. 28 U.S.C. §§ 1346(b), 2674.

Congress passed ECPA to update the existing surveillance law framework for new technologies. Recognizing the threat to privacy posed by the continuous, systematic acquisition of electronic communications during their transmission, Congress extended existing prohibitions against the unauthorized interception of wire and oral communications, enacted in **Title III of the Omnibus Crime Control** and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. III, §§ 801–804, 82 Stat. 211 (codified as amended at 18 U.S.C.A. §§ 2510-2522 (West 2000 & Supp. 2004)), to electronic communications. Congress intended for Title III to protect electronic communications, like telephone calls, during the entirety of the transmission phase.

In 1986, Congress amended Title III by enacting the Electronic Communications Privacy Act of 1986. Specifically, Congress added a new category of covered communications, i.e., "electronic communications," which would now be protected, and whose interception would be regulated, by Title III. Electronic communications are those types of non-oral or wire communications that occur, *inter alia*, over computers, digital-display pagers, and facsimile ("fax") machines. *See* 18 U.S.C. § 2510(12).

5

## V.    **ARGUMENT**

The extension of Title III to electronic communications was the centerpiece of Congress's effort to harmonize treatment of new and old communications technologies under federal law, and reflected intent to protect electronic communications, like telephone communications, through the entirety of the transmission phase.

ECPA reflected a broad, bipartisan effort to update federal surveillance law to take account of new communications technologies.

Two features of ECPA are relevant to this case. ECPA extended Title III's protections against the **unauthorized "interception]** of wire and oral communications to electronic communications. *See* ECPA § 101, 100 Stat. at 1848; 18 U.S.C. § 2511(1)(a) (2000).

Second, ECPA created a new chapter of the criminal code, often referred to as the Stored Communications Act (SCA), prohibiting unauthorized access to communications held in "electronic storage" by a **service provider**.

Sony Corporation violated ECPA § 201, 100 Stat. at 1860; 18 U.S.C.A. §§ 2701, 2703(a) (West 2000 & Supp. 2004). Title III's prohibition on unauthorized interception and prohibition on unauthorized access to communications.

### STATEMENT OF FACTS

1.    On or about **April 14, 2004** – Plaintiff a former employee with the Federal Deposit Insurance Corporation (FDIC) was approached at her former place of employment, 1717 H Street, N.W., Washington, D.C. by JENEKIA JOHNSON a 25-year old intern involved in a Federal theft.

Ms. JOHNSON alleged that she was a victim of Federal theft. Plaintiff acting in her approved capacity as a team leader, promptly escorted Ms. Johnson to a closed door office to protect Ms. Johnson's privacy.  Plaintiff provided words of wisdom, examples of her life, advice and quoted a few Bible scriptures as examples.

2.       On or about **April 15, 2004**, JENEKIA JOHNSON, the approached Plaintiff verbally stated that, **"She I Lied.** Here again, Plaintiff promptly escorted Ms. Johnson to a closed door office to protect Ms. Johnson's privacy.

3.       Plaintiff was unaware that Ms. Johnson unlawfully, intentionally and knowingly possessed a Sony cassette tape recorder which is defined as an electronic, mechanical and other devices, to wit, bugging and receiving devices, knowing and having reason to know that the design of said devices rendered them primarily useful for the purpose of the surreptitious interception of wire, oral and electronic communications, and that said devices and components thereof had been and would be sent through the mail and transported in interstate commerce. See **U.S.C.Title 18, United States Code, Sections 2512(1)(b) and 2.**

4.       On or about **April 19, 2004 (2:22pm)**–Plaintiff received an e-mail from Douglas Fahey (unlicensed FDIC contractor) requested investigative interview with Gibson-Michaels regarding conversation she had with student intern Johnson on **April 14-15, 2004** which made the intern **"Feel Threaten"**

5.       On or about April 14, 2004 Jenekia Johnson reported the conversation she initiated with Plaintiff on April 14-15, 2004. James T. Lantleme, Assistant Director affirmed by sworn affidavit that after speaking to Ms. Johnson he stated that: _**"A Bit Later I asked Jenekia if she felt threaten by Yolanda, and she said that she did."**_

James Lantelme contacted William Kmentz (Security) and conveyed to Kmentz that Plaintiff "Threaten" Ms. Johnson instead of making her "feel threaten" initiated by James T. Lantelme.

6.       On or about **April 19, 2004 (4:04pm)** – Plaintiff sent e-mail to her former first-line supervisor Carl Polvinale regarding both interns alleged theft.  Plaintiff informed Polvinlae that she cooperated and provided Douglas Fahey with a statement. Mr. Polvinale concurred that a bible verse is not a threat.

7

7.    On or about **April 21, 2004** – Plaintiff affirmed that Ms. Johnson provided her with false information on April 21, 2004. Ms. Johnson informed her that Doug Fahey asked her how did she feel after speaking to Plaintiff.

8.    On or about **April 21, 2004** –James T. Lantelme e-mailed and hand-carried a memorandum to Plaintiff re: Mandatory attendance at Investigative Meeting. J.Lantelme stated, that: "*I direct you to meet with Mr. Fahey at his office, and I direct you to cooperate in the interview. 'Failure to attend the interview and cooperate will result in disciplinary actions being taken against you.*" Plaintiff was forced, directed; coerce to attend the investigative interview.

9.    On or about **April 22, 2004 (8:26am)**–D. Schull (Union Representative) requested a delay in meeting. Schull requested a statement from intern. What was the charge against me, or what specifically were the charges" Douglas Fahey (contractor) didn't respond.

10.    On or about **April 22, 2004 (10:29am)** –James Lantelme responded to Plaintiff. Lantelme wrote that:  **"I have received your emailed, your request are duly noted"** Lantelme threaten Plainiff with disciplinary actions if she didn't meet with contract employee Doug Fahey.

12.    On or about **April 26, 2004** –J.Lantelme e-mailed and hand-carried a memorandum to Plaintiff with an order, threat, and coherence to cooperate, and meet with Douglas Fahey on April 28, 2004 re investigative interview. Mr. Lanteleme stated that:"**Failure to meet would result in disciplinary actions against you."** (See Tab 3)

13.    On or about **April 29, 2004** – Plaintiff e-mailed union re: Draft summary of investigative interview. Discussed Johnson's recording her own self stating that **she lied on tape** (False Statement), cheated on time and attendance (Federal Fraud); and engaged into a discussion of how Johnson was prohibited to work directly for her "blood relative-nepotism"

14.    On or about **May 11 2004** –Plaintiff sent rebuttal to James Lantelme re: illegal tape recording. **Intern stated that she lied on tape,** nepotism of intern working for aunt, defrauding the government. Fahey expressed embarrassment as intern stated that she lied which was said on tape "self-incrimination"

15.    On or about **June 1, 2004** –Plaintiff sent letter via e-mail and hand carried ltr. to the FDICs OIG Patricia Black regarding violation of 18 U.S.C., Section 119-Interception of Oral Communication by summer intern and contractor; not Federal Agent as required under Omnibus Street Crime Act, Court Order, and purpose of Federal Crime; not bible verse.

16.    On or about **June 9, 2004** –Plaintiff received ltr. From James Lantelme **"Proposed 10-Day suspension from duty without pay"**

17.    On or about **June 29, 2004** –Plaintiff sent letter to Special Agent Baker **re: illegal taping Case No:4003351**. Plaintiff requested that Baker reopen illegal recording to include Identity Theft Title 22, subtitle I, Chapter 32, and Subchapter III. Identity Theft and Assumption Deterrence Act, 18 U.S.C., section 1028.

18.    On or about **August 17, 2004** –E.Bovenzi directed Plaintiff to report to her office.   Erica Cooper Bovenzi presented to Plaintiff a memorandum re*:"Notice of Decision – Five (5) Calendar Day Suspension"*

19.    On or about **November 4, 2004** – Plaintiff received FPS Police report from Agent Moore regarding illegal interception of oral communication CCN: NO4003351.

20.    **December 22, 2004** – Metropolitan Police Department Ms. Gray confirmed that Douglas Fahey (contractor) was not certified or pending certification as a private investigator.

21.    **December 8, 2005** DOJ Criminal Division confirmed that the FDIC nor did Douglas Fahey a Court Order to engage into wire tap or the interception of Gibson-Michaels communication.

Jenekia J. Johnson and Douglas R. Fahey violated Plaintiff's privacy rights, interception of oral communications, violations 18 U.S.C. – 119 without a Court order, **18 U.S.C. §§ 2511 et seq. (the "Federal Wiretap Act"**, Electronic Communications Privacy Act  Manufacture, distribution, possession, and advertising of wire, oral, or electronic communication intercepting devices prohibit manufactures, assembles, possesses, or sells any electronic, mechanical, or other

device, knowing or having reason to know that the design of such device renders it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications, and that such device or any component thereof has been or will be sent through the mail or transported in interstate or foreign commerce.

## VII. The Fourth Amendment

The Constitutional Amendment which must first be discussed provides: The right the of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. Amend. IV. This Amendment ". . . was specifically propounded and ratified with the memory of . . . *Entick v. Carrington*, 95 Eng. Rep. 807 (1765).

The Fourth Amendment, accordingly, was adopted to assure that Executive abuses of the power to search would not continue in our new nation. Justice White wrote in 1984 in *United States v. Karo*, 468 U.S. 705 (1984), a case involving installation and monitoring of a beeper which had found its way into a home, that a private residence is a place in which society recognizes an expectation of privacy; that warrantless searches of such places are presumptively unreasonable, absent exigencies.

> **"The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks. The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech. *U.S. v. U.S. District Court*, 407 U.S. at 317."**

The Fourth Amendment further requires prior warrants for any reasonable search, based upon prior-existing probable cause, as well as particularity as to persons, places, and things, and the interposition of a neutral magistrate between Executive branch enforcement officers and citizens.

Plaintiff quoted a bible verse inside a closed door office. A bible quotation **does not rise to a level** of an unlawful interception of oral communications without a court order. Sony Corporation ignored stringent standards of Title III, in violation of Plaintiff's First and Fourth Amendment.

**The First Amendment**

The First Amendment provides: **Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof**; or abridging the **freedom of speech**, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. CONST. Amend. I.

This Amendment, the very first which the American people required to be made to the new Constitution, was adopted, as was the Fourth, with *Entick v. Carrington*, and the actions of the star chamber in mind. As the Court wrote in *Marcus v. Search Warrants,* 367 U.S. 717 (1961).

Jenkia J. Johnson and Douglas R. Fahey (Defendants) violated Plaintiff's rights in accordance to §247 -religious property; **obstruction of persons in the free exercise of religious beliefs** 18 U.S.C. § 2511- Interception and disclosure of wire, oral, or electronic communications, 18 U.S.C. 18 U.S.C. §247, 18 U.S.C. § 1030(a)(2).

Federal Trade Commission Act (FTCA), 18 U.S.C. §1028 – Identity Theft Fraud and Related Activities, 18 U.S.C – 241 Conspiracy Against Rights, 18 U.S.C. 242 Deprivation Of Rights Under Color Of Law, 18 U.S.C. 245 Federally Protected Activities, 18 U.S.C 246 - Deprivation Of Relief Benefits.

11

Douglas Fahey intentionally, willfully and without a court order placed a Sony Tape recorder manufactured by the Sony Corporation (Service Provider) inside the purse of Jenekia Johnson on April 14, 2004 and April 15, 2004, coached the intern, and met intern inside a vacant office). Fahey's evidence was relied upon by the FDIC on January 21, 2005 and March 31, 2006.

## SUMMARY OF ARGUMENT

Congress passed ECPA to update the existing surveillance law framework for new technologies. Recognizing the threat to privacy posed by the continuous, systematic acquisition of electronic communications during their transmission, Congress extended existing prohibitions against the unauthorized interception of wire and oral communications, enacted in **Title III of the Omnibus Crime Control** and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. III, §§ 801–804, 82 Stat. 211 (codified as amended at 18 U.S.C.A. §§ 2510-2522 (West 2000 & Supp. 2004)), to electronic communications. Congress intended for Title III to protect electronic communications, like telephone calls, during the entirety of the transmission phase.

One of Title III's **most restrictive provisions** is the requirement that Federal investigative agencies submit requests for the use of certain types of electronic surveillance (**primarily the non-consensual interception of wire and oral communications**) to the **Department of Justice for review** and **approval** before applications for such interception may be submitted to a court of competent jurisdiction for an order authorizing the interception.

Specifically, in 18 U.S.C. § 2516(1), Title III explicitly assigns such review and approval powers to the Attorney General, but allows the Attorney General to delegate this review and approval authority to a limited number of high-level Justice Department officials, including Deputy Assistant Attorneys General for the Criminal Division ("DAAGs").

12

The Federal Deposit Insurance Corporation (FDIC) in past and current practice relied upon, approved, and authorized the use of Securiguard and USEC contract employees to police, harass, wire, monitor, engage into unlawful interceptions of oral communications, target, racially profile and subject predominately Afro-American FDIC employees to bogus investigative interviews conducted by Securiguard/USEC security guards and former unlicensed contract employee Douglas R. Fahey.

## **Exclusionary Rule**

When Congress adopted the federal wiretap law in 1968, one of the protections it wrote into the law was a provision stating that communications intercepted in violation of the law could not be used as evidence in any trial, civil case, or administrative proceeding. 18 USC 2515.

This is called a statutory exclusionary rule. When Congress extended the wiretap law to cover email and other electronic communications, it did not extend the e statutory exclusionary rule of 18 USC 2515 to interception of email or other electronic communications. The rule currently applies only to voice interceptions.

## **Requested Relief**

WHEREFORE, plaintiff prays that this Court:

A. order defendants award Plaintiff an award of $25,000,000.000 (Twenty-Five million dollars)(net)

B. Punitive Damages in the amount of $50,000,000.000 (Fifty million dollars)(net) of

Sony's Corporations' willful violation of 18 U.S.C. § 2511(1)(a) (2000), 18 U.S.C. §

2518(1)(c) (2000), 18 U.S.C.A. § 2510(17) (West 2000 & Supp. 2004)

18 U.S.C.A. § 2701 (West 2000 & Supp. 2004)

18 U.S.C.A. § 2703(a) (West 2000 & Supp. 2004)

Electronic Communication Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848,

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title III, §§

801–804, 82 Stat. 211, 9-7.100 Authorization of Applications for Wire, Oral, and

Electronic Interception Orders.


C. award plaintiff injunctive relief and return of all tape recordings to Plaintiff to and
including records, investigative reports

D. award plaintiff its costs and reasonable attorneys fees incurred in this action; and

E. grant such other relief as the Court may deem just and proper.

                        Respectfully submitted,

                        Yolanda C. Gibson-Michaels (Prose)
                        2210 Anvil Lane
                        Temple Hills, Maryland  20748
                        (301) 630-5062

**EXHIBIT  A**

1)    Documentation of Illegal wire

2)    Documentation of unlicensed Security Guard Police Report

3)    Documentation DOJ Criminal Division

14

## CERTIFICATE OF SERVICE

I **HEREBY CERTIFY** that on this **10th day of October 2006**, a true and exact copy of the foregoing **Complaint** was filed in the United States District Court, Washington, D.C., and named Defendants Jenekia J. Johnson and Douglas R. Fahey by Court Service Process upon named Defendants.

Yolanda C. Gibson-Michaels (prose)
FDIC Information Specialist
2210 Anvil Lane
Temple Hills, Maryland  20748
(301) 630-5062

15

Exhibit 1

Faxed To
FISA Court
on 7/18/06
7/17/06 I
sent certified
mail to FBI
And White house

INDEX  12/07/15 –

| A | DUPLICATE |
| --- | --- |
| | RECORDING OF |
| | ELECTRONIC EAVESDROP |
| | FROM 04/15/04 |

B

SUBJECT:
DATE:

CERTRON

06 1933
**FILED**

NOV 13 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

FDIC Lied to Federal Protection Service
tapes were _NOT_ Lost!!

Sony Corp Did _not_ give
permission to use or approve for
FDIC to use A Sony tape Recorder.

Sony had no right to Approve the
FDIC, Douglas Fahey or Jennifer
Johnson to engage in to illegal
Intercepts of my oral communications
over a Bible Verse.

FDIC's wrote
Description of
Illegal Intercepts
of oral communications

FDIC refused to turn
over _original_ illegal
tape recording Intercept
by unlicensed contractor
w/out BY Order.
Demanded by Law!!

Gibson Michaels suspended
for duly 5 days Based
On Bible Quote inside
a closed box office.
( Reasonable expectation
of Privacy established )

FILE NUMBER: WASHINGTON

*[handwritten: Security Breach Unauthorized]*

Incident Number: 0-0000000186 *[handwritten check mark]*

I would not do anything. She said that Jenekia should confess to taking Kristian's money and go to the Credit Union, withdraw $200 and give it to Kristian over two weeks. She said Jenekia would feel better if she confessed and then said that if she doesn't confess, her guilt will affect her child (Jenekia gave birth to a daughter a few months ago). Yolanda raised a possible affect on her child a number of times.

*[handwritten left margin: Reported Offici ↓ FDIC JAMES Lantelme intimated: coerced "Feelings of threat"]*

I told her that she did the right thing by coming to me. I told her to write down everything that she told me; what happened, who said what and when. I told her to call the investigator right away and tell him all that she told me. I told her that Yolanda's comments were improper.

A bit later I called Jenekia and asked her if she felt threatened by Yolanda and she confirmed that she did. *[handwritten: Lantelme intimated "Feelings of threat"]* *[handwritten right margin: Entrap...]*

After she left, I called Bob Wooding and Randi Mendelsohn to tell them what I intended to do and to ask their advice for dealing with the situation. I then called Erica Bovenzi to tell her what had happened. I also left a message with Bill Kmetz to invoke the Management Response Team.

*[handwritten left margin: Entrapment is illegal]*

After a conference call around 2pm between Randi Mendelsohn, Bill Kmetz, Doug Fahey and me, I called Jenekia to tell her how we were addressing her concerns. I reiterated that it was important for her to write down all that she told me and send it to Mr. Fahey today. I also told her to avoid Yolanda Gibson-Michaels and to tell me if Yolanda further talked to her about anything related to her concerns. She then told me that around 1:30 pm Yolanda had asked her whether she had made any decisions about Yolanda's earlier conversation telling her what to do. Jenekia said she would not drop her charges and would continue to talk to the investigators. She said Yolanda told her she wouldn't be believed and would go to jail for up to 10 years and this would affect her ability to get any other federal job. She sounded upset over the phone while telling me this." (end of memo from LANTELME)

On 14 April 2004 at 15:43Hrs., JOHNSON *[handwritten: (Fahey Wrote statement or Lantelme)]* e-mailed me the following statement of facts *[handwritten: Falsified]*
(ATTACHMENT A):

"Good Afternoon, Earlier this morning at 11:22am, I received a called from Yolanda Michael Gibson requesting me to come to her desk. Once I arrived she informed me that Kristian told her what took place Monday at the office, so she asked me to tell her my side of the story. After telling her the story she asked me to report with her to the project room. After being escorted and seated by Yolanda she stated she love me, I have and will do so much for you and Kristian, I care for you like my child. Next she stated I am not taking side but you know I got Kristian working here. After that she starts to tell me the story on her mistakes and how she asked God for forgiveness because she did not want anything to back firer on her disability child. After that she keep on repeatedly saying I took the money because I either needed it or didn't, after telling her so many times I do not have Kristian money, she finally told me that something bad is going to happen to me and if it doesn't it will happen to your daughter (Jayda). I told Yolanda that I was going to report it to Jim but she told me I shouldn't because he isn't going to do anything and she also keep on telling me that was the wrong thing to do, so leave it between us. Then repeatedly "Do you love you daughter" was all she kept on saying for like 3 minutes "God will forgive you. Next she kept on asking me to send an e-mail to Mr. Fahey, telling him a lye that Kristian and I found our money and to drop the case, and then she wanted me to go over to the credit union and take out a loan for Kristian in the amount of $300.00, or to pay Kristian $200 out of pp#7 and $100 out of pp#8. Then she says if I don't god will punish me. So she tells me to go back to my desk and think about it!

Yolanda calls back at 12:25pm on 4/14/04 to come over to her desk then she say and gives example of Kristian moving slow because of her pregnancy and being unable to open the cabinet our purses were in due to her belly. Then she states repeatedly Kristian could not have done it she moves to slow, and you to were the only one who new where the keys was, and since

**File Number: WASHINGTON** 9/11 **Incident Number: 0-0000000186**

*[handwritten: ATTN: FBI MR. ZACK ]    410-277-6655 (FAX)*

| | | |
|---|---|---|
| Security Level | FDIC Security | |
| Category | Threats | |
| Subcategory | By Employee | **Recorded in IRIMS** |
| Type | | **FDIC Security** |
| Occurred From | 4/14/2004 11:22:00 AM | **Washington, DC** |
| Reported Date/Time | 4/14/2004 11:59:00 AM | |
| Reporting Person | Fahey, Douglas ← | *[handwritten: Unlicensed (FAKE) contractor investigate.* |
| Building/Site | 1717 H St. NW | *Falsified credentials, DEFrauded FDIC, Illegally* |
| Address | | *intertcepted Gibson-methods and commi[t]* |
| Location | 3rd Floor | *18 USC code* |
| Location Details | | |
| Loss/Damage Type | | |
| Incident Status | Ref. to Management | |
| Reported to Police | No | |

[black redaction bar]

Intern felt threatened by words used by employee.    *[handwritten: Intern's inhaled feelings of threat]*

[black redaction bar]

| | |
|---|---|
| **Person Type** | Employee |
| **Barring Notice** | No |
| **Person Details** | |
| Sex | Female                Salutation |
| **Employment Details** | |
| Occupation | Information Specialist |
| **User Defined Fields** | |

[black redaction bar]

| | |
|---|---|
| **Person Type** | ReportingPerson |
| **Barring Notice** | No |
| **Employment Details** | |
| Occupation | Intern |
| **User Defined Fields** | |

*[handwritten: 19]*

*Conspiracy Illegal by Unlicensed Investigator* (handwritten)

**FILE NUMBER: WASHINGTON**

**Incident Number: 0-0000000186**

*Jenckra Johnson* (handwritten, right margin)

*Douglas Frisby initiated contract* (handwritten, left margin)

I again contacted JOHNSON and arranged to meet her in the lobby of 1717 H St. NW at 12:10Hrs. on 15 April 2004. We met at that time and then moved to vacant FDIC office space on the 1st floor. I placed a <u>Sony cassette recorder with a 90 minute tape (45+ minutes</u> per side) into her purse. I attached an <u>omni directional power condenser</u> <u>microphone</u> to the <u>recorder and</u> positioned the microphone so that it extended slightly, but unobtrusively from her purse. I suggested the way in which she could begin a conversation with GIBSON-MICHAELS might be to tell her she had been thinking about what she told her the day before. JOHNSON then advised me that just before coming downstairs to meet me in the lobby, she walked past GIBSON-MICHAELS' cube, and GIBSON-MICHAELS poked her head out and asked her if she had thought about what they talked about. JOHNSON told me she told GIBSON-MICHAELS no, that she was trying not to think about it. I then allowed <u>JOHNSON to look at some notes I had</u> <u>handwritten on a piece of paper</u> with potential ideas on how to begin a conversation with GIBSON-MICHAELS. After looking at the suggestions, JOHNSON came up with her own idea. She asked if she could just go to her and tell her that she felt threatened by her the day before. She said that was how she really felt. I agreed that expressing her true feelings would probably be the easiest way for her to succeed in beginning a dialogue. I turned the recorder to the "record" position and recorded a brief introduction, saying the date (April 15) and the time was 12:20Hrs. and that it was the beginning of the tape. At that time, <u>JOHNSON left the room</u> <u>enroute to the 3rd floor of the building to locate</u> GIBSON-MICHAELS. The tape subsequently revealed that approximately 10 minutes after leaving the room, JOHNSON located GIBSON-MICHAELS and began a conversation with her. The tape continued to run and record their conversation for approximately the next 37 minutes. I located JOHNSON at 13:20Hrs. on the third floor and accompanied her back to the 1st floor where I then recovered the recorder and tape from her purse. JOHNSON reported that the tape ended before their conversation did. She reported that at the end of the conversation, [off tape] GIBSON-MICHAELS hugged her. JOHNSON remarked that GIBSON-MICHAELS was "a lot nicer than yesterday." <u>I asked</u> <u>JOHNSON if there were any witnesses to the conversation</u> they just had and <u>she stated,</u> no.

*Sony corp. will be sued Sony had no right give FDIC in Seavood permission to use a Sony cover. They didn't Sony didn't have to point out their own tape Sony Hoyd to approve any tape Hoyd initiated by unlicensed contractor* (handwritten, left margin)

*Initially by James Lanier. A Bit later I asked Jack did she feel threatened so I convey same!!* (handwritten, right margin)

*PPM 2000 ft Performances* (handwritten, right margin)

On **15 April 2004**, at 13:44Hrs., GIBSON-MICHAELS sent JOHNSON and BEARD an e-mail with a subject, LIE DETECTOR TEST. The e-mail read:
    "This is a suggestion to get to the truth regarding your situation. Lie Detector test are 100 percent accurate. You both might want to consider taking a lie detector test; or volunteer since both of you are 100% certain that it wasn't you. Also, taking a lie detector to determine that it was someone else other than yourselves will give both of you a chance to resume your good friendship. Or the investigator might request that you are both tested regarding the facts surrounding your situation. The test only cost sometimes between $20.00 or $40.00 dollars.
    FDIC might be able to administer the test free. Since there is a possibility that there could have been someone other than yourselves; then you both should take the test together or separate and apart. If you are telling the **TRUTH**...then there shouldn't be a problem with taking a **LIE** detector test to save your friendship. (SMILE)... " (end of e-mail)

On **15 April 2004**, at 14:11Hrs., GIBSON-MICHAELS sent JOHNSON an internet link regarding polygraphs. The subject was, Information regarding the Polygraph (Lie Detector Test). JOHNSON forwarded that message to me on 19 April, stating that she wasn't able to review the link due to a virus warning.

On **16 April 2004**, at 10:20Hrs., I left a voice message for JOHNSON to call me. At 14:20Hrs., I had a telephone conversation with her. I asked her to reflect on the conversation she had with GIBSON-MICHAELS the day before and tell me how she was feeling about all of this. JOHNSON stated she wouldn't be as comfortable with GIBSON-MICHAELS from now on and

# MEMORANDUM

TO: Official File

FROM: Contract Investigator B. Cohen

SUBJECT: Investigatory Memorandum Regarding Efforts To Locate Mr. Doug Fahey

DATE: October 31, 2004

During my interview with Mr. Kmetz, he informed me that Mr. Fahey was working with the FBI and undergoing training. Mr. Kmetz informed that Mr. Fahey had worked as a contractor for Securiguard. On October 12, 2004, I called Securiguard in an effort to locate Mr. Fahey. I was told that Mr. Fahey was not employed by Securiguard and was told to contact USEC Corporation. I contacted USEC Corporation and was told that Mr. Fahey was no longer employed by USEC Corporation and that USEC Corporation would not provide me with Mr. Fahey's home telephone number. I asked if USEC Corporation would forward a letter to Mr. Fahey's home. The USEC employee stated they would forward my letter to Mr. Fahey. On October 12, 2004, I sent the attached letter to USEC Corporation. On October 12, 2004, I sent the attached letter to Mr. Fahey at the Federal Bureau of Investigation.

I was informed by a FDIC employee that she thought that Mr. Fahey lived in northern Virginia. There was a telephone listing for a Douglas Fahey in northern Virginia. I made two telephone calls to the number listed and left messages on an answering machine for Douglas Fahey.

To date, Mr. Fahey has not responded to any of my inquiries.

Company Name


IRIMS

she will act out in a violent manner to cause harm to co-workers. However, if her current level of inappropriate behavior is allowed to continue it could well escalate into more serious behaviors.

Submitted,

Steve Kaufer, CPP
Co-Founder
Workplace Violence Research Institute

END OF KAUFER'S REPORT

No further information at this time.

**End of Report**

FDIc Approved for Douglas Fahey to Input Negative Data into FDICs Secure Database. Send negative data to outside Contractor (violation of Privacy Rights). The FDIC unlawfully placed Gibson-Michaels inside a Red Security Bux Based on Fake contracts, Illegal Records by A 25 year old intern Involved in A Federal THEFT. All evidence Provided to Congress, Senate, FBI, Private Attorneys

**Company Name**

*FDIC Approved an unlicensed contractor to Access FDIC's secure Database FDIC Employees Victims of Identity Theft Reported 2005.*



**IRIMS**

*Incident Number: 0-0000000018*          *File Number: WASHINGTON*          *Security Level: FDIC Security*

On September 2, 2003, at 17:15Hrs., Ms. Gibson-Michaels sent a memo to Erica Cooper, and copied POLVINALE, LANTELME and me. In it, she requests an immediate reassignment to another section based on the unfair treatment that she believes she has received since allegations were unjustly filed against her. She again stated POLVINALE never counseled her regarding any type of behavior regarding the incident on August 12. She also makes note of her own morale issue within her group since she was unjustly placed on the FDIC surplus list, her father has been diagnosed with prostate cancer, her son is severely autistic with a seizure disorder and she is the only one left in her group which was formerly comprised of 4 other individuals who are no longer at FDIC. See her memo for full and complete information. [A-16]

On September 2, 2003, at 17:16Hrs., GIBSON-MICHAELS sent an e-mail to LANTELME, making comment on what she recognized as an inconsistency in the statement of HOPKINS concerning the use of the word, stupid. Refer to her memo for full and complete information. [A-11, pg.1]

On September 4, 2003, I received a memo from Paul Mitchell, whose office is located in front of GIBSON-MICHAELS' cubicle. MITCHELL stated although he didn't remember the date, he recalled that several weeks ago, as GIBSON-MICHAELS was walking past his office, he heard her say in an angry tone of voice - 'I told you not to ask me any more stupid questions!' He stated GIBSON-MICHAELS then went to her cubicle and he didn't hear anything more. He also wrote that he did not hear anything before her statement, but later learned from others that GIBSON-MICHAELS and HOPKINS had some sort of argument that day. Please refer to MITCHELL's memo [A-17]

On September 4, 2003, at 10:00Hrs., a MRT meeting was held regarding this matter. In attendance were Bill Kmetz, JR Harris, Mary Laverty and Doug Fahey. LAVERTY stated she would notify Bob Wooding to communicate with Carl Polvinale and insure that GIBSON-MICHAELS' behavior is monitored in the future. She also stated no corrective or disciplinary action would be warranted in this case as POLVINALE performed a counseling session with GIBSON-MICHAELS. It was also decided that the Workplace Violence Research Institute would be consulted to assess the incident.

On September 5, 2003, I contacted the Workplace Violence Research Institute and spoke with Steve Kaufer. I briefed Mr. Kaufer on this matter and advised I would send the case documentation for him to review and assess. On September 6, 2003, I e-mailed the documentation to Mr. Kaufer.

Case open pending review by the Workplace Violence Research Institute.


On 8 September 2003, GIBSON-MICHAELS requested that Sukari Smith, Rose Harley, and Alva Vaden be interviewed concerning their knowledge of this incident.

On 9 September 2003, in continuing this investigation, I spoke with and then received an e-mail from Sukari Smith. In her subsequent e-mail, (A18) SMITH stated she could not verify whether or not she was in her office between 10:00-10:30Hrs. on 8/12/03, but did say she did not hear anything aggressive above the normal hub of that area. SMITH informed me that she first found out about the incident on 9/8/03 when GIBSON-MICHAELS talked with her about it and asked her if she would talk with me and tell me she didn't hear anything that day.

On 9 September 2003, I spoke with and then received an e-mail from Rose Harley. In her subsequent e-mail, (A19), HARLEY provided her recollection of what she called the "discussion" that occurred on 8/12/03 between Terry Hopkins and Yolanda Gibson-Michaels. HARLEY stated it was sometime before lunch, that she hear someone way words to the effect, "I don't want to talk to you anymore. You're insulting." She stated she didn't recognize the voice at the time as Terry Hopkins' and in fact thought it was another employee who works on the third floor. She stated she did recognize Yolanda's voice when she said, "Well, you're insulting." She stated she would describe both voices as being agitated, but did not hear any yelling or screaming which would cause her to leave her office to see what was occurring.

On 9 September 2003, at 10:55Hrs., I spoke with Alva Vaden. VADEN stated she was at work and in her office with the door open on 8/12/03 between 10:00-10:30Hrs. and did not hear anything at all. She stated she found out about the incident when people talked about it in the staff meeting and people talking about it in the hallway. VADEN did not provide a written statement.

Company Name



IRIMS

*Incident Number: 0-0000000018*          *File Number: WASHINGTON*          *Security Level: FDIC Security*

On 10 September 2003, I was notified by Mary Laverty in an e-mail that after completing her review of the information in this report, it was then her understanding that no memo had been issued or formal counseling done with Yolanda Gibson-Michaels. She stated management had not taken corrective action regarding the August 12 incident and was awaiting the results of the investigation before determining what action, if any, to take.

On 10 September 2003, I received a call from Steve Kaufer with the Workplace Violence Research Institute. KAUFER stated it was his opinion, based on the reports I submitted to him, that GIBSON-MICHAELS' behavior was not acceptable and needed corrective action. He noted his believe that she may believe there is some kind of plot or conspiracy against her, and questioned whether a racial issue could be present. He believed there was a veiled threat present for GIBSON-MICHAELS to bring in her martial arts trophies and demonstrate the simulation of lethal karate moves. He stated however there was nothing in the material he reviewed that made him believe that GIBSON-MICHAELS would progress to behavior more serious, and if another incident were to occur, it would be on about the same plane as the current incident. KAUFER stated he would follow-up with a written report.

This case was referred to management for further review.

On 29 September 2003, I received a report from KAUFER as follows:
As you requested I reviewed the available reports and other information related to the concern over Ms. Gibson-Michael's behavior.

The behavior that brought Ms. Gibson-Michael to the attention of the MRT related to her response to an inquiry over leave slips that she requested that Terry Hopkins, her acting supervisor, sign. When questioned about the slips, Ms. Gibson-Michael reacted in a manner that caused Hopkins and others in the immediate area concern for their safety.

Your report clearly details this incident and other unwanted behavior by Ms. Gibson-Michael.

I have reviewed e-mails, statements of witnesses and supervisors, your report and all other documentation made available to me. Based on this review I find:

1. Whether in the context of workplace violence prevention or just common courtesy and civility, the behavior exhibited by Ms. Gibson-Michael on the occasion in question and others is not acceptable. When behavior of one employee causes others in the workplace to feel threatened and at-risk, clearly those actions must cease. Her actions, according to witnesses, included screaming and acting in a hostile and aggressive manner towards co-workers.
2. It appears that Ms. Gibson-Michael believes that actions taken by supervisors and co-workers are part of a larger "plot" against her. I found no evidence that any disciplinary or corrective actions or counseling singled her out.
3. Her comments regarding her black belt and discussion on which portions of a person's body that can be struck to kill them is troublesome. While under normal circumstances, showing off martial arts trophies would be viewed as a gesture of involvement with co-workers, however, given her prior behavior I view it as a veiled threat. She does not, according to information reviewed, have a close personal relationship with others in the office. The display of the trophies and discussion of injury or death that could be caused by martial arts I believe was done to intimidate co-workers. Again, under the FDIC's Workplace Violence Prevention Program, these actions and comments are not .cceptable.

While her actions, methods and language are unwanted and should likely result in corrective action, I don't believe

FILE NUMBER: WASHINGTON

Incident Number: 0-0000000186

After asking GIBSON-MICHAELS to explain some of the specific inconsistencies, THORSTEINSON stopped the interview at 12:55Hrs. and asked for my assurance that nothing from this interview would be used in any potential future criminal proceeding against GIBSON-MICHAELS. I was not able to give him that assurance and we all agreed to contact James LANTELME regarding that issue. I contacted LANTELME by telephone and put him on speakerphone. THORSTEINSON addressed this issue with LANTELME, who stated he would checked with a labor relations attorney and call back. At 13:05Hrs., LANTELME called back and while on speakerphone, said that Jimmy LAWRENCE gave an assurance that nothing from this administrative interview would be used against GIBSON-MICHAELS in any future criminal proceeding. This assurance satisfied THORSTEINSON and the interview resumed.

In all, I addressed the following eleven questions from my interview with GIBSON-MICHAELS. Reference information as to where the relevant transcript information can be found on the tape is included. KEY: JJ = Jenekia Johnson; YGM = Yolanda Gibson-Michaels.

*Fahey and Johnson rehersed on 4/4/04*

40. Didn't she tell you she felt very threatened by you because you said that if nothing happens to her, then things would roll over to Jayda?
ANS: No.

Approximate tape reference information
Tape Counter Number: 112
Time into tape: 11 minutes 58 seconds

*Illegal Interception 18 USC #119*

Relevant Transcript:
JJ: Ah, I just came here only because I thought about everything you said yesterday, and I was upset yesterday but I just tried not to show it. I felt very threatened yesterday by you believe it or not. When you kept um using Jayda (YGM: uh-huh) you know, saying that things would roll over if nothing happens to me if they would roll over to Jayda which I know I heard plenty of times but it's like I just felt very very threatened because it's like you know how you feel inside but I know what is the truth. I know that everything you're saying, yes it sounds, every, I mean, okay, you said...

DISCUSSION on QUESTION 40:
After listening to the tape, GIBSON-MICHAELS maintained her answer to the question was no, saying that JOHNSON said "believing me or not."

39. In fact Mrs. Gibson-Michaels, Ms. Johnson told you that she felt very threatened by you didn't she?
ANS: No. She never felt threatened by me. She said she felt threatened by her sins. I don't know what sins she was talking about.

Approximate tape reference information
Tape Counter Number: 112
Time into tape: 11 minutes 58 seconds

Relevant Transcript:
JJ: Ah, I just came here only because I thought about everything you said yesterday, and I was upset yesterday but I just tried not to show it. I felt very threatened yesterday by you

FILE NUMBER: WASHINGTON

Incident Number: 0-0000000186

believe it or not. When you kept um using Jayda (YGM: uh-huh) you know, saying that things would roll over if nothing happens to me if they would roll over to Jayda which I know I heard plenty of times but it's like I just felt very very threatened because it's like, you know how you feel inside but I know what is the truth. I know that everything you're saying, yes it sounds, every, I mean, okay, you said...

DISCUSSION on QUESTION 39:
After listening to the tape, GIBSON-MICHAELS initially maintained her answer was still no to this question. She first said she believed JOHNSON told her she felt very threatened yesterday "by you believing me or not" instead of "believe it or not." After review of the tape, SCHULL believed JOHNSON said "believe it or not." GIBSON-MICHAELS subsequently changed her answer to, "Yes, she told me that."
NOTE: No where on the tape does JOHNSON talk about her sins or feeling threatened by anything or anyone other than GIBSON-MICHAELS.

31. Did you tell Ms. Johnson that you believed Hecht's could have been threatening her for the money she owed them?
ANS: No.

Approximate tape reference information
Tape Counter Number: 136 and 147
Time into tape: 14 minutes 28 seconds and 15 minutes, 29 seconds

Relevant Transcript (136):
YGM: I was thinking it could have been Hecht's. Cause sometimes people [indistinguishable] threaten people?
JJ: You mean Hecht's?
YGM: Yea, I was thinking. Maybe, I said maybe she had to pay her Hecht's? Cause I don't, Kristian was saying you owe six hundred dollars to Hecht's.

Relevant Transcript (147):
YGM: Okay but you know how everyone's going to look at things the way I look at things. I look at this in fact. The fact well the only thing I'm thinking well maybe you could've gotten into a situation where Hecht's was threatening you or something (indistinguishable)
JJ: No, cause I'm not, haven't been late on a payment and I have never, I haven't been in that situation.

DISCUSSION on QUESTION 31:
After listening to the tape, GIBSON-MICHAELS maintained her answer to that question was still no. She said the question wasn't worded properly; that I should have used the word "situation" in my question to her.

14. Did you suggest to Ms. Johnson that she take a $300 loan from the credit union and pay back Ms. Beard?
ANS: No.

Approximate tape reference information

~~~~~~~~~ WASHINGTON                                    Incident Number: 0-0000000186

worries as far as thinking oh, something might happen to Jayda on her way to the babysitter (YGM: No I'm [indistinguishable] cause you never know) or something like that but that's the, that's the type of stuff that I was thinking maybe..
YGM: Please take, please take my forgiveness, humbly. [indistinguishable] to forgive me I said because I didn't, I don't have the power to curse anyone and I didn't want to make you feel uncomfortable...

DISCUSSION on QUESTION 42:
After listening to the tape, GIBSON-MICHAELS changed her answer to yes. I asked her to tell me why she initially answered, no. She said, "At that point it was no, it wasn't clear. It's clearer now after hearing the tape."

*[handwritten: Removed for B'Rewiss]*

43. Didn't you then apologize to Ms. Johnson for what you said by asking her to take your forgiveness, humbly?
ANS: No.

Approximate tape reference information
Tape Counter Number: 253
Time into tape: 25 minutes 11 seconds

Relevant Transcript:
JJ: Well yesterday, well yesterday it really felt like you had power and you was trying to wish the harmest thing on Jayda and I (YGM: No [indistinguishable]) and I knew in my heart that I had nothing to worry about due to the fact that I didn't take anything so I knew I had no worries as far as thinking oh, something might happen to Jayda on her way to the babysitter (YGM: No I'm [indistinguishable] cause you never know) or something like that but that's the, that's the type of stuff that I was thinking maybe..
YGM: Please take, please take my forgiveness, humbly. [indistinguishable] to forgive me I said because I didn't, I don't have the power to curse anyone and I didn't want to make you feel uncomfortable...

*[handwritten left margin: I asked for forgiveness not favor when company w/ contract]*

*[handwritten left margin: Former Nigro Assaulted Five Employees before Mgr. Supervisor Mr. Nigro]*

DISCUSSION on QUESTION 43:
After listening to the tape, GIBSON-MICHAELS changed her answer to yes. I asked her why she initially answered no. She said she forgot. I asked her how she could forget something so material. She said, "I'm human." She also said that she believed every question was material. I asked her to tell me what she was apologizing for. GIBSON-MICHAELS stated she was apologizing for how JOHNSON felt.

35. Did you say that you didn't want this stolen money case to go up to the level of Jim Lantelme or Carl Polvinale?
ANS: No.

Approximate tape reference information
Tape Counter Number: 307 and 323
Time into tape: 29 minutes 40 seconds and 30 minutes 58 seconds

WASHINGTON

Incident Number: 0-0000000186

conversation, Yolanda asked "did I think about what she said to me the day before", this was to confess to something that I did not do. I also told her that I went home and tried to think nothing of it.

During a conversation that I had with you 10 minutes later, you asked me was there any contact with Yolanda, from the last time we had spoke. I told you then, that I had just ran into her before I met with you. You asked me what was said by her, and I told you then, that all she said was "did I think about what she said yesterday and I said No". You then gave me a piece of paper which had writing on it, on how you wanted me to approach Yolanda. While you were placing the wire in my purse, you asked me to think of another way of approaching Yolanda. My way was to say hello Yolanda, I'm sorry that I lied to you, and yes I did think about what you has said to me yesterday." (end of e-mail)

*5th LIE!!* (handwritten margin note)

Therefore, in summary, the "lie" JOHNSON was referring to on the tape referenced her telling GIBSON-MICHAELS that she had not thought about their previous conversation, when in fact, she had thought about it.

*6th LIE* (handwritten margin note)

The original tape recording and original statement by GIBSON-MICHAELS were stored as evidence in the Operations Center.

CONCLUSION
There is evidence to suggest that GIBSON-MICHAELS did make inappropriate comments to JOHNSON, which supports her allegations that she felt threatened by GIBSON-MICHAELS. A copy of this report, a copy of the recorded tape, and a copy of GIBSON-MICHAELS' statement were provided to LANTELME on 3 May 2004.

*(handwritten right margin):* 3 Bible verses vis closed door OFFICE to A thieve era by him pr. is not A crime

*(handwritten bottom):*

FDIC IS NOT Approved For An Illegal Survelance Program to Spy, Intercept, Wire tape Federal Civil Servant Employees Inside A Closed door OFFICE because of A Bible verse. Gibson-michaels was Suspended from duty without pay 5 days. Removed from FDIC on 1/22/05 And 3/31/06. Blew the whistle on FDIC's Fraud, money laundering, Inside Trading Receivership Fraud!!

24

**Fahey, Douglas**

| | |
|---|---|
| **From:** | Johnson, Jenekia |
| **Sent:** | Thursday, April 15, 2004 8:01 AM |
| **To:** | Fahey, Douglas |
| **Cc:** | Lantelme, James; Johnson, Jenekia |
| **Subject:** | Yolanda meeting with me in Project room |

*ReasonABle expcatation*
*OF privacy !!*

## ATTACHMENT B

Good Morning,                                                April 15, 2004

After proof reading I realized I had several mistakes and additional information I
forgot to add. Yolanda did bring up Kristian needing the money more then me
due to her maternity leave, and how it is crazy to believe Kristian will or can walk
or move so fast to steal anything. Then she says if you don't drop the case she
will bring up some notes she have on me days I did not attend work and put in no
leave. *(Fahey wrote)(why did Johnson cc here[?])*

Good Afternoon,   *(Fahey wrote shortcut)*            April 14, 2004

Earlier this morning at 11:22am, I received a called from Yolanda Michael
Gibson requesting me to come to her desk. Once I arrived she informed me that
Kristian told her what took place Monday at the office, so she asked me to tell her
my side of the story. After telling her the story she asked me to report with her to
the project room. After being escorted and seated by Yolanda she stated she
love me, I have and will do so much for you and Kristian, I care for you like my
own child. Next she stated I am not taking side but you know I got Kristian
working here. After that she starts to tell me the story on her mistakes and how
she asked God for forgiveness because she did not want anything to back fire
on her disability child. After that she kept on repeatedly saying I took the money
because I either needed it or didn't, after telling her so many times I do not have
Kristian money, she finally told me that something bad is going to happen to me
and if it doesn't it will happen to your daughter (Jayda). I told Yolanda that I was
going to report it to Jim, but she told me I should not because he is not going to
do anything, and she also keep on telling me that was the wrong decision to
make, so leave it between us. Then repeatedly "Do you love you daughter" was  *E LiE*
all she kept on saying for like 3 minutes "God will forgive you! Next she kept on
asking me to send an e-mail to Mr. Fahey, telling him a lye that Kristian and I  *(Fahey wrote)*
found our money and to drop the case, and then she wanted me to go over to the
credit union and take out a loan for Kristian in the amount of $300.00, or to pay
Kristian $200 out of pp#7 and $100 out of pp#8. Then she says if I don't god will
punish you. So she tells me to go back to my desk and think about it *(Fahey wrote)*

*(handwritten left margin: charged my personal He stripes Blk use)*
*(handwritten: Repsd!!)*
*(handwritten right margin: Story!! BiBle verse Read)*

*Conspiracy, Framed up, Fraud*

**Johnson, Jenekia**
**From:** Johnson, Jenekia
**Sent:** Friday, May 21, 2004 11:38 AM
**To:** Johnson, Jenekia
**Subject:** FW: Recording conversation

-----Original Message-----
**From:** Johnson, Jenekia
**Sent:** Wednesday, April 28, 2004 3:27 PM
**To:** Fahey, Douglas    *FBI AGENT, Washington DC Field Office*
**Cc:** Lantelme, James    *202-278-2000*
**Subject:** Recording conversation

April 28, 2004

Good afternoon Mr. Fahey,

I am writing this e-mail to make clear of my statement of April 15th in a *18 USC 1d False Statement* tape recording conversation between Yolanda Gibson-Michael and myself. In that conversation, I said "I did lie to you Yolanda", which I was referring to an earlier conversation between she and I. In that conversation, Yolanda asked "did I think about what she said to me the day before", this was to confess to something that I did not do. I also told her that I went home and tried to think nothing of it.

During a conversation that I had with you 10 minutes later, you asked me *Framed up →* was there any contact with Yolanda, from the last time we had spoke. I told you then, that I had just ran into her before I met with you. You asked me what was said by her, and I told you then, that all she said was "did I think about what she said yesterday and I said No". You then gave me a piece of paper which had writing on it, on how you wanted me to approach Yolanda. While you were *← Framed up* placing the wire in my purse, you asked me to think of another way of approaching Yolanda. My way was to say hello Yolanda, I'm sorry that I lied to *conspiracy* you, and yes I did think about what you has said to me yesterday.

**Johnson, Jenekia**

| | |
|---|---|
| **From:** | Johnson, Jenekia |
| **Sent:** | Friday, May 21, 2004 8:58 AM |
| **To:** | Fahey, Douglas |
| **Subject:** | Yolanda |

May 21, 2004

I saw Yolanda Wednesday May 19, at 12:25pm, after leaving lunch. She stopped and said "Hi Jenekia Johnson"; I was so much in a shock she spoke to me so I just kept on walking as she stood their standing as though she was going to say something to me.

PS. I wasn't sure whether I should document this.

MS. JOHNSON was in Shocked Because She Knows I was FRAMed-up!! Conspired Agast!! illegally taped Recorded (interueptio oral conuecetions) because of her lying Federal Alledyed Theft while employed beg her Aunt (James T. Cinteme) Personal Private Secretry.

NETU Union Excerpts

by Ms. Gibson-Michaels comments but by what the investigation would uncover about herself. It is understood that Ms. Johnson decided then to go to Mr. Lantelme and tell him about the conversation from her point of view before Ms. Gibson-Michaels told him about their conversation and what may be uncovered in the investigation Mr. Fahey was going to pursue. Mr Lantelme also says that statements regarding harm coming to Ms. Johnson's baby or her were clearly unprofessional statements, meant to create fear and encourage Ms. Johnson to consider withdrawing her case with Mr. Fahey. [The only way Ms. Johnson could have perceived harm would come to her or her child was if she had something to hide from god. She said herself she knew she had no worries for her or Jayda as she didn't take the money. That the nature of the conversation was biblical and spiritual, and one that Ms. Johnson herself said she has heard many times, should not provoke fear from Ms. Gibson-Michaels but from a higher power.] The entire part of that conversation was discussing a biblical verse and what the bible says, and showing that if a parent does commit a sin, that in fact, that sin can transfer to their children and their children's children for three to four generations as written as the word of god. Why the repeating of something Ms. Johnson has heard so many times before, now she viewed as fearful because it came from Ms. Gibson-Michaels is unclear and makes no sense. If she was fearful, it was fearing for her physical safety, and if that was the case, then why did Ms. Johnson continue talking and privately meeting with Ms. Gibson-Michaels after Mr. Lantelme told her on the 14th of April not to? The pattern of events that followed that conversation on April 14th and April 15th do not show that fear or threatening of any kind were an element of concern to Ms. Johnson. Mr. Lantelme also states that Ms. Gibson-Michaels provided the investigator with inaccurate information. This was not

Gibson Michael's
Curse the
Bible

NETU UNION Excerpts

intentionally done. Ms. Gibson-Michaels did not say anything she did not believe was true. She answered everything truthfully and honestly. 43 questions were asked of her. Eleven questions were addressed and six were not answered to Mr. Fahey's satisfaction. These six questions are what has been previously addressed above. Out of the six questions management is using to support the inaccurate information provided to an investigator charges, two of them were not clearly stated and she did not hear what he did. Four of them have been explained. We do not feel it is correct in saying that in not recalling a part of such a lengthy conversation it was done intentionally or to mislead the investigator. Clearly that she did not remember saying those things at all. We are asking that the proposed ten calendar day suspension not be granted as the employee was acting in a mentor capacity and no threat was issued by Ms. Gibson-Michaels to Ms. Johnson what so ever. If there had been a physical threat, the MRT team would have reacted differently in dealing with the situation. We formally are asking that these accusations be removed from the employees personnel file and an apology made to her for the irrational behavior from Mr. Lantelme and the inappropriate treatment of Mr. Fahey.

NETU UNION Excerpts

intentionally done. Ms. Gibson-Michaels did not say anything she did not believe was true. She answered everything truthfully and honestly. 43 questions were asked of her. Eleven questions were addressed and six were not answered to Mr. Fahey's satisfaction. These six questions are what has been previously addressed above. Out of the six questions management is using to support the inaccurate information provided to an investigator charges, two of them were not clearly stated and she did not hear what he did. Four of them have been explained. We do not feel it is correct in saying that in not recalling a part of such a lengthy conversation it was done intentionally or to mislead the investigator. Clearly that she did not remember saying those things at all. We are asking that the proposed ten calendar day suspension not be granted as the employee was acting in a mentor capacity and no threat was issued by Ms. Gibson-Michaels to Ms. Johnson what so ever. If there had been a physical threat, the MRT team would have reacted differently in dealing with the situation. We formally are asking that these accusations be removed from the employees personnel file and an apology made to her for the irrational behavior from Mr. Lantelme and the inappropriate treatment of Mr. Fahey.

**Response to an Inquiry from
The Honorable Barbara A. Mikulski
On Behalf of Ms. Yolanda Gibson-Michaels**

**The following information is provided by the Federal Deposit Insurance Corporation's
Legal Division**

As noted in her letter, Federal Deposit Insurance Corporation management conducted an investigation into alleged misconduct by Ms. Gibson-Michaels. Ms. Gibson-Michaels was interviewed by management as part of the investigation and she was properly directed to cooperate in that interview. Ms. Gibson-Michaels specifically complains about one of her conversations with a co-worker being tape-recorded by that co-worker and relied upon by management.

The FDIC Legal Division reviewed the circumstances of the allegedly illegal interception and determined that the tape recording of a face-to-face conversation by a party to that conversation is lawful. Both the D.C. Code [§23-542] and Federal law [18 U.S.C. §2511] permit the recording of a conversation, with the consent of a party to the conversation.

As a result of management's findings that Ms. Gibson-Michaels had engaged in unprofessional and/or inappropriate behavior, the FDIC proposed that she be suspended without pay for ten days. On August 17, 2004, after reviewing the proposed suspension and its supporting evidence, the deciding official concluded that Ms. Gibson-Michaels's actions warranted disciplinary action. Based on her review of the record, and in consideration of Ms. Gibson-Michaels's employment record, the deciding official mitigated the proposed ten calendar day suspension to a five calendar day suspension from duty and pay beginning on August 23, 2004 and ending on August 27, 2004.

We would note that while the taping was not a violation of law nor of Ms. Gibson-Michaels's rights, the deciding official did not listen to the tape recording of the conversation nor did she rely on the portions of the transcript from the taped conversation contained in the record as she felt it was unnecessary in determining whether the underlying conduct took place.

Throughout the entire process, Ms. Gibson-Michaels has been afforded all the due process rights to which she is entitled, including the right to a representative, to reply orally and in writing to the proposal, to receive all evidence relied upon and to appeal the suspension decision under the grievance procedures contained in the negotiated agreement between the National Treasury Employees Union (NTEU) and the FDIC. She is being represented in this matter by the labor union for FDIC employees, the NTEU.

FDIC Lied to Senator Mikulski. Tape was used, listen to, and Relied upon by FDIC Against Gibson michaels. Read FDICs Response to Albert R. Wynn Page 2.

### Response to in inquiry from
### The Honorable Albert R. Wynn
### on behalf of Ms. Yolanda Gibson-Michaels

## The following information is provided by the FDIC's Legal Division

As Ms. Gibson-Michaels notes in her letter, the Federal Deposit Insurance Corporation management conducted an investigation into alleged misconduct by Ms. Gibson-Michaels. She was interviewed by management as part of the investigation and she was properly directed to cooperate in that interview. As a result of management's findings about Ms. Gibson-Michaels' misconduct, the FDIC has proposed to suspend her without pay for ten days. Ms. Gibson-Michaels has been afforded all the due process rights to which she is entitled, including the right to a representative, to reply orally and in writing to the proposal, and to receive all evidence relied upon. She is being represented in this matter by the labor union for FDIC employees, the National Treasury Employees Union (NTEU). If management decides to suspend Ms. Gibson-Michaels, she and NTEU may file a grievance and ultimately appeal the action to binding arbitration.

Ms. Gibson-Michaels specifically complains about one of her conversations with a co-worker being tape-recorded by that co-worker and relied upon by management. The conversation was recorded with the consent of a party to the conversation, as permitted by D.C. Code §23-542 and Federal law, 18 U.S.C. §2511. Nevertheless, Ms. Gibson-Michaels has objected to this as part of her reply to the proposed suspension.

*[handwritten right margin: FDIC Relied Upon Illegal Intercept]*

In addition to the process described above, on or about April 30, 2004, Ms. Gibson-Michaels contacted the FDIC's Office of Diversity and Economic Opportunity about many of the same events discussed in her letter to your office. She is being provided all the due process rights afforded to all federal employees in the pursuit of EEO claims.

Furthermore, on or about May 6, 2004, Ms. Gibson-Michaels also filed an unfair labor practice charge with the Federal Labor Relations Authority, essentially based upon the same incidents. The FLRA is currently conducting an investigation into her unfair labor practice charge allegations.

Finally, the FDIC Office of Inspector General (OIG) was an addressee on the letter Ms. Gibson-Michaels sent to you and she has asked OIG to conduct an inquiry into this matter. We will, of course, fully cooperate with any inquiry conducted.

*[handwritten at bottom: D.C. Law, Federal Law requires court order, sworn Affidavit, Federal crime (NOT Able Qualified). Federal Agent or US. Federal Attorney to conduct a Wiretap. NOT Sony Tape Recorder inside an Intern's purse by Contractor who is Also Unlicensed Investigator (DC.).]*

**AFFIDAVIT**

CITY OF WASHINGTON D.C. }

DISTRICT OF WASHINGTON D.C. }


I, **James T. Lantelme,** hereby solemnly swear that I am employed in the position of Assistant General Counsel, grade EM,  Legal Division, Federal Deposit Insurance Corporation (FDIC), 550 17th Street, NW, Room H-3123, Washington D.C. 20429.  My race is Caucasian, my color is white, my gender is male, my date of birth is November 10, 1953, and my religion is Lutheran.  I have had prior EEO activities. I have undergone EEO training regarding the preventing, reporting and mitigating of harassment.  My first line supervisor is Deputy General Counsel Erica Bovenzi.

I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint.  I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

I have known Ms. Gibson-Michaels since 1998. Our relationship is purely professional.   I am currently Ms. Gibson-Michaels' second line supervisor. I have had some contacts with Ms. Gibson-Michaels since she came to this section in 1998 including during an FDIC reduction-in-force during 2002 and 2003.  I am aware that Ms. Gibson-Michaels is an African-American female, skin color black.  I was not aware of Ms. Gibson-Michaels' age or religion or of any prior EEO activity by Ms. Gibson-Michaels until I was told about them during the course of this investigation.  I learned of the specifics of Ms. Gibson-Michaels' EEO Complaint when I read the Investigator's Letter of Authorization during my interview on September 20, 2004.

*Inspired by James Lambert me see Lambert stmt*

Regarding Accepted Issue One, I did initiate an FDIC administrative investigation against Ms. Gibson-Michaels on or about April 14, 2004 for allegedly threatening Student Intern Jenika Johnson. On or about April 14, 2004, Ms. Johnson came to my office visibly upset. Ms. Johnson stated, in substance, that approximately 15 minutes prior, Ms. Gibson-Michaels had threatened Ms. Johnson in connection with an investigation of a theft of her money on FDIC property. Ms. Johnson stated that a few days prior she had reported a theft of money to FDIC Security and that a fellow FDIC Student Intern was a suspect. Ms. Johnson indicated that Ms. Gibson-Michaels talked to her and urged her to drop the charges against the other Student Intern as well as give the other Student Intern money. Ms. Gibson-Michaels had asked Ms. Johnson to do the right thing and indicated to Ms. Johnson that if she did not something bad could happen to Ms. Johnson's child. I asked Ms. Johnson to prepare a write-up of her conversation with Ms. Gibson- Michaels.

*Bible verse*

FDIC procedures indicate that when an employee receives a threat the FDIC Management Response Team (MRT) should be contacted. I contacted William Kmetz of FDIC Security and reported my conversation with Ms. Johnson. I did take some notes of my conversation with Ms. Johnson which I believe that I gave to Investigator Douglas Fahey. I am unaware who informed Ms. Gibson-Michaels that she was the subject of an administrative investigation. To the best of my knowledge the resultant investigation was conducted by Investigator Fahey and Mr. Kmetz. I was not involved in the resultant investigation or the investigative decisions made by Investigator Fahey and Ms. Kmetz.

I was aware that sometime later in April 2004, Investigator Fahey planned to have Ms. Johnson speak to Ms. Gibson-Michaels about the alleged threat. Investigator Fahey

Affiant's Initials _____

had asked Ms. Johnson to conceal an electronic recorder on her person in order to record the conversation between herself and Ms. Gibson-Michaels. The decision to employ a hidden electronic recorder on Ms. Johnson's person was made by either Investigator Fahey or Security Chief Kmetz. I did ask the FDIC Assistant Director for the Labor and Employee Relations Section Randi Mendelsohn about the use of the hidden electronic recorder. I was told that she was aware of and approved the use of the hidden electronic recorder.

After the completion of the investigation, I received a report on Ms. Gibson-Michaels' actions from the MRT. The report indicated that there was no likelihood of physical violence against Ms. Johnson by Ms. Gibson-Michaels. It was nonetheless plain to me that Ms. Gibson-Michaels had interfered with the FDIC theft investigation and had lied about it to the investigators. I proposed that Ms. Gibson-Michaels receive a ten day suspension. Subsequently, the deciding official reduced the ten day suspension to a five day suspension. Ms. Gibson-Michaels has served the five day suspension.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Two, on or about August 12, 2003, I did initiate an administrative investigation against Ms. Gibson-Michaels for allegedly threatening Ms. Terry Hopkins. On or about August 12, 2003, Ms. Hopkins came to my office and

informed me that as an Acting Supervisor she had asked Ms. Gibson-Michaels questions about a leave slip that Ms. Gibson-Michaels had given to Ms. Hopkins. I believe that the initial conversation took place in Ms. Hopkins' office. Ms. Hopkins stated, in substance, that Ms. Gibson-Michaels had objected to Ms. Hopkins' questioning of a signature on the leave slip. Ms. Hopkins felt intimated and left her office. Ms. Hopkins stated that Ms. Gibson-Michaels had followed her down a hall berating Ms. Hopkins. I believe that FDIC Secretary Eyvonne Bryant witnessed Ms. Gibson-Michaels berating Ms. Hopkins.

I contacted the MRT and a subsequent investigation was conducted. The investigation resulted in a conclusion that there was no likelihood of violence. Subsequently, I did orally counsel Ms. Gibson-Michaels about her behavior toward Ms. Hopkins. I do not believe that I made a written comment about my counseling session with Ms. Gibson-Michaels.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Three, Ms. Gibson-Michaels has been treated differently than Mr. Frank Nigro. Mr. Nigro is no longer a FDIC employee. Mr. Nigro retired from FDIC in 2003. I have been told that Mr. Nigro did have an explosive temper. I believe Mr. Nigro received an official admonishment that if he did not retire he would have been subject to severe disciplinary action. I believe that Ms. Gibson-

Affiant's Initials _____

Michaels had complained to FDIC about Mr. Nigro's behavior. I was Mr. Nigro's fourth level supervisor and did not personally know Mr. Nigro. I believe that Mr. Nigro is a white Caucasian male. I do not know Mr. Nigro's religion. I assume Mr. Nigro's age is over 50 since he was able to retire from the FDIC.

I have no knowledge that Mr. Nigro's race, color, gender, age and religion played any role or influenced in any manner FDIC Officials' decisions and actions about Mr. Nigro's on the job behavior. I have no knowledge of any type of favorable treatment given to Mr. Nigro by FDIC Officials due to Mr. Nigro's race, color, gender, age, and religion.

I am unaware that the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job performance. I believe that Ms. Gibson-Michaels is performing her current duties in a competent manner. I have been asked the question of whether the events involving the Accepted Issues have affected Ms. Gibson-Michaels' job opportunities. I am unaware of any such FDIC job opportunities for Ms. Gibson-Michaels. FDIC has been in the process of becoming smaller and losing positions.

In summary, I have no knowledge of any type of discrimination by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion.

I have nothing further to add to my affidavit.

I have reviewed this statement, which consists of five (5) pages, and hereby solemnly swear that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

Affiant's Initials_____

I declare under the penalty of perjury that the foregoing is true and correct. Executed this

___27th___ day of _September 2004_ (date)

James T. Lantelme

Sworn and Subscribed by _____    Barry Cohen, EEO Contract

Investigator, on____9/27/04____ (date).

Affiant's Initials

**AFFIDAVIT**

**CITY OF WASHINGTON D.C. }**

**DISTRICT OF WASHINGTON D.C. }**


I, **William A. Kmetz,** hereby solemnly swear that I am employed in the position of Assistant Director, grade E-1, Security Management Section, Administration Division, Federal Deposit Insurance Corporation (FDIC), 1776 F Street, NW, Washington D.C. 20429. My race is Caucasian, my color is white, my gender is male, and my date of birth is January 4, 1950, my religion is Roman Catholic. My first line supervisor is Mr. Michael Rubino, Associate Director, Corporate Services Branch, Administration Division. I have had routine FDIC training regarding the preventing, reporting and mitigating of harassment.

I have read the Investigator's Letter of Authorization with the Accepted Issues regarding Ms. Yolanda Gibson-Michaels' EEO Complaint. I have read and signed the Notice of Rights of Witnesses in EEO Investigations form.

I am not sure how long I have known Ms. Gibson-Michaels. I had seen her once or twice as a FDIC employee. Our relationship is purely professional. I am aware that Ms. Gibson-Michaels is an African-American female. I do not know her age or her religion. I have never supervised Ms. Gibson-Michaels. I have no knowledge of any prior EEO activity by Ms. Gibson-Michaels. I learned of Ms. Gibson-Michaels's current EEO Complaint when I was interviewed on September 27, 2004.

Regarding Accepted One, FDIC has a zero tolerance policy regarding allegations of work place violence. I chair the FDIC Management Response Team (MRT). The

MRT is an informal group of FDIC Officials concerned with the prevention of work place violence at FDIC. On or about April 14, 2004, I believe that I did receive a telephone call from James Lantelme of the FDIC Legal Division informing me as a MRT member and as Assistant Director- FDIC Security that a Ms. Johnson, a Legal Division employee had been allegedly threatened by Ms. Gibson-Michaels. I do not remember the specifics of my telephone call with Mr. Lantelme. After my telephone call with Mr. Lantelme, I contacted Investigator Douglas Fahey and asked him to investigative and make contact with Ms. Johnson. Mr. Fahey was a contract investigator with the Securiguard Corporation. Mr. Fahey was in charge of investigation. Mr. Fahey conducted the interviews in connection with the alleged threat investigation.

Mr. Fahey's investigation was formalized in the FDIC's Investigations Resources Information Management System (IRIMS). IRIMS is data base that contains investigative and security reports conducted by FDIC Security. I have forwarded Mr. Fahey's IRIMS report of this investigation to the Legal Administration Division

I do remember Mr. Fahey consulting with me about the use of a small electronic tape recorder which was to place in Ms. Johnson's handbag in order to secretly record a conversation between Ms. Johnson and Ms. Gibson-Michaels about the alleged threats that Ms. Gibson-Michaels had made to Ms. Johnson. Mr. Fahey indicated that Ms. Johnson had agreed to the placing of the tape recorder in her handbag in order to record her conversation with Ms. Gibson-Michaels. Mr. Fahey stated that since Ms. Johnson had agreed to the recording of her conversation with Ms. Gibson-Michaels that the recording of the conversation was a normal investigative technique. I advised Mr. Fahey to consult with FDIC Labor Relations and Mr. Lantelme regarding the use of the tape

recorder. I understand that this coordination was done, but I do not have any specific details. However, I believe that the participants agreed that since Ms. Johnson had given her permission to record her conversation with Ms. Gibson-Michaels that the use of the hidden recorder was permissible and legal.

My actions and decisions in connection with Accepted Issue One were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue One constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

*False*

Regarding Accepted Issue Two, I do not recall the specifics of the 2003 investigation involving an alleged threat made by Ms. Gibson-Michaels to Ms. Terry Hopkins. The investigation was assigned to Investigator Fahey. I believe the investigation was conducted in a routine manner and formalized in the FDIC IRIMS. The report for this investigation has been forwarded to FDIC Administration.

My actions and decisions in connection with Accepted Issue Two were not influenced in any manner by Ms. Gibson-Michaels' race, color, gender or any other factors such as her age, and religion. I deny that my actions and decisions in connection with Accepted Issue Two constituted any type of reprisal against Ms. Gibson-Michaels. Ms. Gibson-Michaels was treated as any other FDIC employee would have been treated regarding an employee threat allegation.

Regarding Accepted Issue Three, I have no recollection of any events regarding this issue. I do not know Mr. Frank Nigro. I do not recall any conversations or email

Page 3 of

messages about Mr. Nigro's FDIC job behavior. I have no knowledge of any FDIC favorable treatment of Mr. Nigro based on his Caucasian race, white color, male gender, and such factors as his age and religion.

Mr. Fahey is no longer employed as a contract Investigator by FDIC. He is currently employed by the Federal Bureau of Investigation.

In summary, I have no knowledge of any type of discrimination or reprisal actions by FDIC Officials based on Ms. Gibson-Michaels' race, color, sex, age, and religion. To the best of my knowledge Ms. Gibson-Michaels was treated as any other FDIC employee.

I have nothing further to add to my affidavit.

I have read the foregoing statement consisting of _____4_____ pages, each of which I initialed, and it is true and complete to the best of my knowledge and belief. Any corrections that I have made have my initials next to the correction. This statement is made of my free will without any threat, promise of immunity, or inducement. I understand that the information I have given is not to be considered confidential and that it may be shown to interested parties.

_____
Signature


Subscribed and sworn before me in _Washington DC_

this_____8th_____day of ___October___, 2004

Investigator _____

## PRIVACY ACT NOTICE TO INTERVIEW WITNESSES
## (OTHER THAN COMPLAINANT)
## FOR EMPLOYMENT DISCRIMINATION COMPLAINT INVESTIGATIONS

### GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

### AUTHORITY

The authority to collect the information requested by this interview is derived from one or more of the following:

Title 5, Code of Federal Regulations, Section 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

### PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the complaint of discrimination in the delivery of federally assisted or federally conducted programs or services. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the complaint of discrimination. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to **FDIC** activities, to the intelligence agencies of the Federal Government, or to others for uses as published in the Federal Register.

### EFFECTS OF NONDISCLOSURE

Disclosure of the information sought is voluntary; however, failure on the part of **FDIC** employees to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you, up to and including termination. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

_____      _____
Signature of Interviewer       Signature of Witness (person providing statement)

Date: _10-8-04_

Place: _Washington, DC_



**Federal Deposit Insurance Corporation**
3501 N. Fairfax Drive (Room 801-1231), Arlington, VA 22226-3500

Office of Diversity and Economic Opportunity

<div align="center">

NOTICE OF RIGHTS OF WITNESSES
IN
EEO INVESTIGATIONS

</div>

Pursuant to the provisions at 29 C.F.R. §1614.108, federal agencies are required to investigate all aspects of discrimination complaints. The investigation shall include a thorough review of the circumstances under which the alleged discrimination occurred, and the treatment of members of the complainant's protected group(s) as compared with the treatment of other employees in the organizational segment in which the complaint arose.

All employees having any knowledge of the matter complained of are required to cooperate with the investigator who is conducting the investigation. The investigator is authorized to administer oaths and require that statements of witnesses be reduced to an affidavit. The witness must swear to or affirm to the truth of the statements before the investigator or a third party, without a pledge of confidentiality. The investigator is also authorized to obtain copies of relevant employment records, policy statements, and regulations.

As a witness, you have the following rights:

1. To be provided a Notice of Authorization that identifies the investigator and explains the investigator's authority and responsibility in the conducting the investigation.

2. To have a representative present at any meeting/discussion with the investigator. The representative can advise you on how to respond to the investigator, but cannot respond for you.

3. To receive sufficient information concerning the claim(s) and basis(es) of the complaint and circumstances under which the complaint arose in order for you to accurately respond to the questions posed by the investigator.

4. To be provided access to documents you previously prepared or had access to, if they are necessary for you to review in order to respond to questions posed by the investigator.

5. To review your affidavit and make corrections or other changes prior to signing the affidavit.

I HAVE READ AND UNDERSTAND MY RIGHTS AS A WITNESS IN EEO INVESTIGATIONS.

*IGNORED LAW*

**Gibson-Michaels, Yolanda C.**
**From:**     Lawrence, James R.
**Sent:**     Wednesday, June 02, 2004 5:33 PM
**To:**       Gibson-Michaels, Yolanda C.
**Subject:**  RE: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS
              INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

Thanks for the information.    I enjoyed speaking with you.

-----Original Message-----
**From:** Gibson-Michaels, Yolanda C.
**Sent:** Wednesday, June 02, 2004 5:23 PM
**To:** Lawrence, James R.
**Subject:** FW: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS
INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

**Subject:** RE: CHAPTER 119 - WIRE AND ELECTRONIC COMMUNICATIONS
INTERCEPTION AND INTERCEPTION OF ORAL COMMUNICATIONS

Additional information...

# US federal wiretapping laws as of Jan. 2000

Contents:

- CRIMES:
    - 18 USC, PART I, CHAPTER 119 - WIRE AND ELECTRONIC
      COMMUNICATIONS INTERCEPTION AND INTERCEPTION
      OF ORAL COMMUNICATIONS (includes 18 USC 2510-2522)
    - 18 USC, PART I, CHAPTER 121 - STORED WIRE AND
      ELECTRONIC COMMUNICATIONS AND TRANSACTIONAL
      RECORDS ACCESS (incl. 18 USC 2701-2711)
- CRIMINAL PROCEDURE:
    - 18 USC, PART II, CHAPTER 205 - SEARCHES AND
      SEIZURES (incl. 18 USC 3117, "Mobile tracking devices"; non-
      wiretapping sections elided)
    - 18 USC, PART II, CHAPTER 206 - PEN REGISTERS AND
      TRAP AND TRACE DEVICES (incl. 18 USC 3121-3127)
- TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAMS
    - 47 USC, CHAPTER 9 - INTERCEPTION OF DIGITAL AND
      OTHER COMMUNICATIONS (incl. 47 USC 1001-1021; most
      CALEA provisions are in this part)

# FDIC

**Federal Deposit Insurance Corporation**

Legal Division

April 21, 2004

**TO:**        Yolanda Gibson-Michaels
               Information Specialist

**FROM:**    James T. Lantelme
               Assistant General Counsel

**SUBJECT:**  <u>Mandatory Attendance at Investigatory Meeting</u>

Mr. Douglas Fahey, an investigator with the Division of Administration, notified you by an e-mail on Monday, April 19, 2004, of his need to meet with you for purposes of an investigative interview.  Via return e-mail, you stated that "I will not subject myself to any form of investigatory interviews".  Instead, you provided him with a written statement.

Please be advised that attendance at this investigative interview is mandatory.  As a member of the bargaining-unit, you may bring a union representative to the interview.  By this memorandum, I direct you to meet with Mr. Fahey at his office for purposes of the interview he has requested, and I direct you to cooperate in the interview.  He is available on Friday, April 23rd at 2:00pm.  I direct you to contact him to confirm the time for your appointment.

Failure to attend the interview and cooperate will result in disciplinary action being taken against you.

Cc:  Douglas Fahey
     William Kmetz
     Robert Wooding
     Carl Polvinale

# FDIC

**Federal Deposit Insurance Corporation**

April 26, 2004

**TO:**      Yolanda Gibson-Michaels
Information Specialist

**FROM:**   James T. Lantelme
Assistant General Counsel

**SUBJECT:**  <u>Mandatory Attendance at Investigatory Meeting</u>

Due to an excused absence, you were unable to attend an investigative interview with Mr. Douglas Fahey, an investigator with the Division of Administration, scheduled for Friday, April 23rd at 2:00pm. Mr. Fahey has notified you by an e-mail on Friday, April 23, 2004, that he has rescheduled your interview to Wednesday, April 28th, 2004 at 9:30am at his office in the F Street building, room 1C27C.

Please be advised that attendance at this investigative interview is mandatory. As a member of the bargaining-unit, you may bring a union representative to the interview. By this memorandum, <u>I direct you</u> to meet with Mr. Fahey at his office for purposes of the interview he has requested, and <u>I direct you</u> to cooperate in the interview. <u>I direct you</u> to contact him to confirm the time for your appointment.

Failure to attend the interview and cooperate will result in disciplinary action being <u>taken against</u> you.

Cc:  Douglas Fahey
     William Kmetz
     Robert Wooding
     Carl Polvinale

# MEMORANDUM

TO: Official File

FROM: Contract Investigator B. Cohen

SUBJECT: Investigatory Memorandum Regarding Efforts To Locate Mr. Doug Fahey

DATE: October 31, 2004

During my interview with Mr. Kmetz, he informed me that Mr. Fahey was working with the FBI and undergoing training. Mr. Kmetz informed that Mr. Fahey had worked as a contractor for Securiguard. On October 12, 2004, I called Securiguard in an effort to locate Mr. Fahey. I was told that Mr. Fahey was not employed by Securiguard and was told to contact USEC Corporation. I contacted USEC Corporation and was told that Mr. Fahey was no longer employed by USEC Corporation and that USEC Corporation would not provide me with Mr. Fahey's home telephone number. I asked if USEC Corporation would forward a letter to Mr. Fahey's home. The USEC employee stated they would forward my letter to Mr. Fahey. On October 12, 2004, I sent the attached letter to USEC Corporation. On October 12, 2004, I sent the attached letter to Mr. Fahey at the Federal Bureau of Investigation.

I was informed by a FDIC employee that she thought that Mr. Fahey lived in northern Virginia. There was a telephone listing for a Douglas Fahey in northern Virginia. I made two telephone calls to the number listed and left messages on an answering machine for Douglas Fahey.

To date, Mr. Fahey has not responded to any of my inquiries.

4d-47



October 12, 2004

Mr. Douglas Fahey
C/O USEC Corporation
7531 Leesburg Pike
Suite 402
Falls Church, VA
22043

Dear Mr. Fahey,

I am a Contract EEO Investigator who is investigating the EEO Complaint of FDIC employee Yolanda Gibson-Michaels. I am attaching my Letter of Authorization from FDIC to investigate Ms. Gibson-Michaels' Complaint. I would appreciate if I can speak to you about your role as a FDIC Contract Investigator regarding Accepted Issues One and Two in the Letter of Authorization. Ms. Gibson-Michaels has alleged that she was discriminated against due to her African-American race, black color, female gender, age and religion in connection with her Complaint. Without your statement the official record may be incomplete. My home number is ███████████. Thank you for your cooperation.

Yours truly,

Barry Cohen

→ PAID   NOT EMPLOYED by Securiguard ←   Dallas Fahey Pg. 2

**Federal Deposit Insurance Corporation**
Division of Administration, Acquisition and Corporate Services Branch
1700 Pennsylvania Avenue, NW, Room 4104
Washington, DC 20006

## MODIFICATION OF CONTRACT

| 1. Modification Number:  2 | 2. Effective Date:  See Block No. 6 below |
|---|---|
| Vendor's Name and Address:  → Securiguard, Inc.  Attn: Fred Williamson  6858 Old Dominion Drive, Suite 307  McLean, Virginia 22101 | Modification of Contract/Order Number:  **Contract No. 99-00086-C-J3**  ("FDIC Security Services")  Dated:  April 25, 1999 |

This Modification is Issued Pursuant To:

☐ Authority of the FDIC Contracting Officer.     ☑ Mutual Agreement of the Parties Hereto.

Description of Modification

The purpose of this Modification is to:

1) Change the names of the Key Personnel;
2) Re-incorporate the requirement for completing GSA Form 139; and
3) Confirm that incumbent Security Officers who have been certified in Adult CPR Initial Training are not required to re-certify prior to working on this Contract.

As a result, Contract No. 99-00086-C-J3 is modified as stated on the following pages.

☐ Contractor is not required to sign this document     ☑ Contractor is required to sign this document and return 2 copies to issuing office.

| 3. Contractor: Securiguard, Inc.  By: _Patricia W.L. Marvil_ | 4. Federal Deposit Insurance Corporation:  By: _C. Follin_ |
|---|---|
| Name and Title (type or print).  Patricia De L. Marvil, Chairman/CEO | Name of Contracting Officer:  Carolyn Follin |
| 5. Date Signed: _June 25, 1999_ | 6. Date Signed: _7/7/99_ |

Modification No. 2
To Contract No. 99-00086-C-J3
Page 2 of 4

Contract No. 99-00086-C-J3 is modified as follows:

## Changes to the Contract:

1.  Article 3.1 ("Key Personnel") is modified to change the names of the Key Personnel, as follows:

    *Delete:*

    | Name | Title | Effective Date |
    |------|-------|----------------|
    | J. Stephen Johnson | Project Manager | May 17, 1999 |

    *Replace with:*

    | Name | Title | Effective Date |
    |------|-------|----------------|
    | Douglas Fahey | Project Manager | June 1, 1999 |

## Changes to the Statement of Work:

2.  The FDIC is modifying the Statement of Work to re-incorporate the requirement for completing GSA Form 139. FDIC will revert back to relying on both Contractor's electronic personnel timekeeping system and the GSA Form 139's to verify Contractor Personnel time and attendance for billing purposes. As a result of this change, Sections 4.4.2, 5.1, 5.5.1, and 9.1 of the Statement of Work are modified as follows:

    A.  Section 4.4.2 ("Records") is modified to add the words, "GSA Form 139". Therefore, the last sentence of this Section is deleted in its entirety and replaced with the following:

        "Records shall include but not be limited to: Incident Reports, Operations Logs, Patrol Officer Reports, TAS Reports, Weapons Inventory and Maintenance Forms, FDIC Equipment Inventory, GSA Form 1051, Visitor Logs, GSA Form 139 and Contractor Personnel data."

FDIC LEO Investigator confirmed Fahey was not employed by Securiguard. Fahey was paid by Securiguard and USGC

**Modification No. 5**
**To Contract No. 99-00086-C-J3**
**Page 3 of 4**

C.   Effective March 1, 2000, the FDIC hereby adds a new Investigator position to the Contract. As a result, the Statement of Work is modified to include the following language as Section 10.3.9:

"<u>Qualifications</u>. The Investigator shall have completed an accredited law enforcement academy and possess a minimum of 3 years investigative experience. The Investigator shall have a private investigator (PI) license for Washington, DC and Virginia unless otherwise waived by the FDIC Oversight Manager.

"<u>Duties</u>. The Investigator's duties shall include, but not be limited to the following:

- Conduct long-term, short-term, and odd hour investigations;
- Conduct interviews;
- Develop and follow leads;
- Take statements;
- Gather information and facts;
- Research records;
- Analyze and evaluate information;
- Prepare narrative reports;
- Prepare statistical reports;
- Institute and maintain databases;
- Coordinate FDIC's security awareness day;
- Develop FDIC's security awareness program;
- Evaluate crime prevention programs;
- Develop and recommend changes to current FDIC programs; and
- Travel to FDIC field offices for investigative or information purposes, as requested by the FDIC Oversight Manager.

This is a plain clothes, unarmed position. The Investigator shall carry a cell phone. The Investigator shall work 8 hours per day, 5 days per week, excluding holidays.

D.   Section 3.1 of the Contract (<u>"Key Personnel"</u>) is modified to change the names of the Key Personnel as follows:

Delete:

| "Name | Title | Effective Date |
|-------|-------|----------------|
| Douglas Fahey | Project Manager | June 1, 1999 |
| Archie Moses | Site Supervisor (Washington, DC location) | April 25, 1999 |
| Ernest Brooks | Site Supervisor (Arlington, VA location) | May 17, 1999 |
| Patrick Devine | Security Operations Center Supervisor | May 17, 1999" |

And replace with:

| "Name | Title | Effective Date |
|-------|-------|----------------|
| Charles Boring | Project Manager | October 6, 1999 |
| Joseph Ortman | Site Supervisor (Washington, DC location) | December 1, 1999 |
| Archie Moses | Site Supervisor (Arlington, VA location) | December 1, 1999 |
| Douglas Fahey | Investigator | March 1, 2000" |

**Attachment 2 to Modification No. 5**

Securiguard, Inc.

**PRICING SCHEDULE**
**FOR**
**CONTRACT NO. 99-00086-C-J3**
**AS MODIFIED UNDER MODIFICATION NO. 5**

Contractor's hourly rates include any and all wages, overhead, general and administrative expenses and profit or fee. *The hourly rates below reflect a 3 cent increase in the rates specified in the original Contract for all security related labor categories, as authorized under Modification No. 5. The schedule below also includes hourly rates for the new Investigator position added to the Contract under Modification No. 5.*

| Labor Category | Initial Period (Years 1 & 2) Hourly Rate | Option Pd. 1 (Year 3) Hourly Rate | Option Pd. 2 (Year 4) Hourly Rate | Option Pd. 3 (Year 5) Hourly Rate |
|---|---|---|---|---|
| Project Manager | $ 29.92 | $ 31.26 | $ 32.46 | $ 32.43 |
| Site Supervisor | $ 21.17 | $ 21.41 | $ 22.03 | $ 22.01 |
| Security Operations Ctr. Technician | $ 20.27 | $ 20.48 | $ 20.48 | $ 20.48 |
| Security Operations Center Officer | $ 19.26 | $ 19.20 | $ 19.41 | $ 19.54 |
| Shift Commander | $ 20.27 | $ 20.48 | $ 20.48 | $ 20.48 |
| Security Officer (Guard II) | $ 19.26 | $ 19.20 | $ 19.41 | $ 19.54 |
| Secretary I | $ 17.62 | $ 17.40 | $ 17.41 | $ 17.40 |
| General Clerk III | $ 15.82 | $ 15.80 | $ 16.11 | $ 16.10 |
| Investigator | $ 33.33 | $ 34.17 | $ 35.18 | $ 36.12 |

ASIS Certification Review Program

**"The instructions were very approachable and sincere in assisting students."**

Douglas Fahey, PCI    Corporate Security Investigator    FDIC

Page 6

## PCI Review Program

**Registration Hours**

Thursday, April 14, 2005
5:00 pm - 6:30 pm

Friday, April 15, 2005
7:00 am - 8:00 am

## AT-A-GLANCE

April 14-16, 2005

8:00 am - 5:00 pm

Saturday, April 16, 2005
8:00 am - 1:00 pm

**Registration Fees**

ASIS members:    $685
Nonmembers:    $835

## PROGRAM-A

Registration fees include continental breakfasts, a luncheon on the first day of the program, daily coffee/soda breaks, and all handout materials. Registration does not include hotel costs.

**Program Advisor**

**Dennis Shepp, CPP**
Shepp Johnman Inc.
Edmonton, Alberta

**Faculty**

**James S Cawood, CPP, PCI, PSP**
President
Factor One
San Leandro, CA

**Fritz Weidner, PCI**
President & CEO
Weidner & Associates
Columbus, OH

Faculty subject to change without notice.

**Hotel Information**

April 15-16, 2005
Crowne Plaza Redondo Beach
300 N. Harbor Drive
Redondo Beach, CA 90277
800-368-9760 or 410-318-888
Fax: 310-376-1930

The Crown Plaza Redondo Beach Los Angeles, and accessible from and Long Beach, ASIS has a limit the rate of $144 single/double, plus reservations by the deadline of ASI, when making your reservations.

*"The instructions were very approachable and sincere in assisting students."*

Douglas Finlay, PCI    Corporate Security Investigator    FDIC

## PROGRAM-A

## PROGRAM-AT-A-GLANCE

### PCI Review Program

**Registration Hours**

Thursday, April 14, 2005
5:00 pm–6:30 pm

**Friday, April 15, 2005**
7:00 am–8:00 am
8:00 am–5:00 pm

Saturday, April 16, 2005
8:00 am–1:00 pm

**Registration Fees**

ASIS members: $685
Nonmembers:     $835

Registration fees include continental breakfasts, a luncheon on the first day of the program, daily coffee/soda breaks, and all handout materials. Registration does not include hotel costs.

### Program Advisor

Dennis Shepp, CPP
Shepp Johnman Inc.
Edmonton, Alberta

### Faculty

James S Cawood, CPP, PCI, PSP
President
Factor One
San Leandro, CA

Fritz Weidner, PCI
President & CEO
Weidner & Associates
Columbus, OH

*Faculty subject to change without notice.*



### Hotel Information

April 15–16, 2005

[Code of Federal Regulations]
[Title 5, Volume 1]
[Revised as of January 1, 2005]
From the U.S. Government Printing Office via GPO Access
[CITE: 5CFR4.2]


[Page 10]

## TITLE 5--ADMINISTRATIVE PERSONNEL

### CHAPTER I--OFFICE OF PERSONNEL MANAGEMENT

PART 4_PROHIBITED PRACTICES (RULE IV)--Table of Contents

Sec. 4.2  Prohibition against racial, political or religious discrimination.

   No person employed in the executive branch of the Federal Government who has authority to take or recommend any personnel action with respect to any person who is an employee in the competitive service or any eligible or applicant for a position in the competitive service shall make any inquiry concerning the race, political affiliation, or religious beliefs of any such employee, eligible, or applicant. All disclosures concerning such matters shall be ignored, except as to such membership in political parties or organizations as constitutes by law a disqualification for Government employment. No discrimination shall be exercised, threatened, or promised by any person in the executive branch of the Federal Government against or in favor of any employee in the competitive service, or any eligible or applicant for a position in the competitive service because of his race, political affiliation, or religious beliefs, except as may be authorized or required by law.

[28 FR 10024, Sept. 14, 1963]

FDIC engaged into Prohibited personnel practices. I was interrupted on April 28, 2004 by an unlicensed investigator. Illegally taped. Suspended from work; questioned regarding my Religion by and Approved by FDIC FAKE investigator Douglas Fahey.

Ignored Procedures re: Religious. The procedure to ignore all communications.

PM
SEP
2004

FDIC Legal Division
Legal Service Unit
550 Seventh St NW – Room H-3081
Washington, DC  20429-9990

X-RAY

2004

W............. and ........ P.C.
P.O. Box 369
Morrisville, VT 05661-8800

14 %

**Elgas, G. Penny**

| | |
|---|---|
| From: | Kmetz, William A. |
| nt: | Wednesday, September 22, 2004 1:42 PM |
| | Elgas, G. Penny |
| Cc: | Harris, John (JR) |
| Subject: | EEO Investigation |
| Sensitivity: | Confidential |

Here is the information you requested. The original documents are on file in our Physical Security office. Mr Harris is my POC on this. He can be reached at X83615. As Mr. Harris indicated, contacting Mr. Fahey may be difficult due to his current assignment. Let me know if you have any questions. Thanks.

**Bill Kmetz**
**202-898-6850**


-----Original Message-----
**From:** Harris, John (JR)
**Sent:** Wednesday, September 22, 2004 10:22 AM
**To:** Kmetz, William A.
**Subject:** FW: 1 more item please - FW: EEO Investigation
**Sensitivity:** Confidential

FY review before I forward to Ms. Penny.

I have retrieved all transcripts from the audio recording concerning the below investigation conducted by Mr. Fahey. SMS es not have any files concerning Mr. Frank Nigro.

Mr. Fahey is willing to talk with the EEO investigator, but is requiring compensation for his time. SMS is unable to contact Mr. Fahey by phone due to his current job status and location with the FBI.

Mr. Fahey, has attended numerous training classes in in workplace violance and retired as a Captain from a New Jersey city police departement.

Mr. Fahey followed the rules of the Weingarten, Refs your inquiry "FDIC" rules, regulations, guidelines for interviewing employees. There are no specific rules within FDIC for this type of interview. Mr. Fahey was using a standard investigative technique when making the recording.

*LIE*

Mr. Fahey, follow the rules of NTEU (Section-7) informing Ms. Yolanda Gibson-Michaels of Employees Right to UNION representation and obtain a signed FDIC 2600/02 (4-99) "Right to Union Representation" in accordance to Global Message issued 5/29/2002.

  

0-016.pdf (109 KB)  0-186.pdf (30 KB)     case 0-186
                                      :tachment.doc (136.

-----Original Message-----
**From:** Kmetz, William A.
**Sant:** Tuesday, September 21, 2004 4:27 PM

1

FDIC Macros Ver. 5.5

## Gibson-Michaels, Yolanda C.

| | |
|---|---|
| **From:** | Lantelme, James |
| **Sent:** | Thursday, April 22, 2004 10:29 AM |
| **To:** | Gibson-Michaels, Yolanda C. |
| **Cc:** | Schull, Donna; Coll, Elizabeth A.; Matthews, Howard L.; Polvinale, Carl A.; Wooding, Robert A |
| **Subject:** | RE: yg-minterview.doc |

I have received your e-mail and your requests are duly noted. It is well established that employees are expected to follow supervisory orders and directions. For a basic overview on this, you may simply refer to the collective bargaining agreement at Article 3, Section 5. Please be advised that my prior orders remain in effect and you are, again, directed to appear and cooperate in an interview with Mr. Fahey tomorrow at 2:00.

-----Original Message-----
**From:** Gibson-Michaels, Yolanda C.
**Sent:** Wednesday, April 21, 2004 3:49 PM
**To:** Lantelme, James; Polvinale, Carl A.
**Cc:** Schull, Donna; Coll, Elizabeth A.; Matthews, Howard L.
**Subject:** yg-minterview.doc

Jim, please provide me with FDICs policy, directive, guidelines, procedures that states that, " Attendance at this investigative interview is mandatory" Additionally, provide me with all statutory requirements, laws, rules and regulations which enables managers to threaten employees with disciplinary actions if the employee has already cooperated with an investigation by providing a written statement regarding the facts from each intern regarding the incident. The investigation surrounds two interns. I was not within the office during the incident. Please provide me with a copy and a carbon copy to Union Officials before the scheduled meeting on Friday, April 23rd, 2004.

April 21, 2004

**TO:**     Yolanda Gibson-Michaels
            Information Specialist

**FROM:**   James T. Lantelme
            Assistant General Counsel

**SUBJECT:** Mandatory Attendance at Investigatory Meeting

Mr. Douglas Fahey, an investigator with the Division of Administration, notified you by an e-mail on Monday, April 19, 2004, of his need to meet with you for purposes of an investigative interview. Via return e-mail, you stated that "I will not subject myself to any form of investigatory interviews". Instead, you provided him with a written statement.

Please be advised that attendance at this investigative interview is mandatory. As a member of the bargaining-unit, you may bring a union representative to the interview. By this memorandum, I direct you to meet with Mr. Fahey at his office for purposes of the interview he



**Web**

ASIS training fdic investigator douglas fahey        Search

**Web**        Results 1 - 10 of about 30 for ASIS        fahey. (0.93 seconds)

File Format: PDF/Adobe Acrobat -
**Douglas Fahey, PCI. Corporate Security Investigator. FDIC. PCI Review program.**
**Registration Hours ... fax: 703-519-6299, or e-mail: asis@asisonline.org. ...**

File Format: PDF/Adobe Acrobat -
taking time out of the office for. training may be difficult. **ASIS has. an online**
CPP review, ... **Douglas Fahey, PCI. Corporate Security Investigator. FDIC ...**
www.asisonline.org/images/store/programs/cppci2005.pdf -

File Format: Microsoft Word 2000 -
**ASIS International Announces New CPP, PCI and PSP Recipients. Alexandria, Va.**
**... Douglas R Fahey, PCI Patrick J Fanning, CPP. FDIC Walt Disney World ...**
www.asisonline.org/newsroom/pressReleases/041504cert.doc -

[                                                    ]

... ASIC/system ASICGS-NET ASICs ASIs ASJ's ASK-QUESTION ASK/INGRES ASLD-LAN ...
Doubts-Young DougBell DoughtyJ Douglas-Home Douglas-Michaels DouglasBell ...
student.fit.store.ak/alp/72-wordlistamerican - 513k -

File Format: Microsoft Excel -
Supplemental Result -

003k - Supplemental Result -

File Format: Microsoft Word -
Supplemental Result -



# Judge Rules Against Wiretaps

## NSA Program Called Unconstitutional

By DAN EGGEN and DAFNA LINZER
Washington Post Staff Writers

A federal judge in Detroit ruled yesterday that the National Security Agency's warrantless surveillance program is unconstitutional, delivering the first decision that the Bush administration's effort to monitor communications without court oversight runs afoul of the Bill of Rights and federal law.

U.S. District Judge Anna Diggs Taylor ordered a halt to the wiretap program, secretly authorized by President Bush in 2001, but took steps in the lawsuit agreed to delay that order until a Sept. 7 hearing. Legal scholars said Taylor's decision is likely to receive heavy scrutiny from the U.S. Court of Appeals for the 6th Circuit, where the Justice Department, unhappy that some criticized her ruling as poorly reasoned.

Ruling in a lawsuit brought by the American Civil Liberties Union and other advocacy groups in the Eastern District of Michigan, Taylor said that the NSA wiretapping program, aimed at communication by potential terrorists, violates privacy and free speech rights and the constitutional separation of powers among the branches of government. She also found that the wiretaps violated the Foreign Intelligence Surveillance Act, the 1978 law instituted to provide judicial oversight of clandestine surveillance within the United States.

"It was never the intent of the framers to give the president such unfettered control, particularly where his actions blatantly disregard the parameters clearly enumerated in the Bill of Rights," Taylor wrote in her 43-page opinion. "... There are no hereditary Kings in America, and no powers not created by the Constitution. So all 'inherent powers' must derive from that Constitution."

See SURVEILLANCE, A18, Col. 1

Hidden Cameras, Hidden Microphones - Federal Law

Page 1 of 4

HIDDEN
CAMERAS

HIDDEN
MICROPHONES

At the Crossroads
of Journalism,
Ethics and the Law

CONTENTS

## FEDERAL LAW

Federal law makes it a crime to intentionally intercept, attempt to intercept or have someone else intercept on one's behalf any wire, oral or electronic communication. It is also prohibited to intentionally use, attempt to use or have someone else use "any electronic, mechanical, or other device" to intercept an oral communication when the device is affixed to or otherwise transmits a signal through radio or through "a wire, cable, or other like connection" used in wire communication.

It is also illegal to intentionally use or disclose any information concerning the substance, purport or meaning of such a communication if one knows or has reason to know the information was obtained illegally.

**At A Glance**

Consent of one party required.

Civil damages are available.

Cellular and cordless telephone communications are protected under federal law

FCC regulations also govern interception and recording.

### Reasonable expectation of privacy

The statute requires a reasonable expectation of privacy for oral communications. In other words, to be protected an oral communication must be uttered by a person exhibiting an expectation that the communication is not subject to interception, under circumstances that justify that expectation.

### Consent

It is legal for a person to intercept a communication if the person is a party to the communication or if one of the parties to the communication has given *prior* consent to the interception, unless the communication is intercepted for the purpose of committing a criminal or tortious (wrongful) act.

It is legal to intercept a radio communication that is transmitted by any governmental, law enforcement, civil defense, private land mobile, or public safety communications system, including police and fire department communications, that is readily accessible to the general public. "Readily accessible" means, among other things, that the communication is not scrambled or encrypted. Interception of amateur, citizens band and general mobile radio services communications is also legal.

*[Handwritten margin notes:]*

FDIC approved cost to place illegal tape recording inside in purse. Sony cassette 90 mr

FDIC continues to use illegal wire, N evidence.

Appellant quoted verse from the Bible. FDIC confirmed on Tape

Bible verse not subject to sting operation by FDIC or contractors meeting in vacant offices to plot, plan, write down read scripts.

**Cellular and cordless telephone communications**

The federal statute was revised in 1986 to include cellular telephone communications and in 1994 to include cordless telephone communications.

**Defenses**

The U.S. Supreme Court has held that the First Amendment protects the publication of truthful information that is lawfully obtained. The federal interception statute, however, prohibits the disclosure or use of *illegally* obtained communications, when there is knowledge or reason to know that they were obtained illegally. Courts have upheld the media's right to publish the contents of communications that were obtained legally but have ruled that the media do not have a special First Amendment defense for publishing the contents of an illegally obtained communication.

Comments in the report of the Senate Judiciary Committee on the original federal statute show that Congress did not mean to prohibit the disclosure of the contents of an intercepted communication that had already become "public information" or "common knowledge." The committee did not, however, define those terms, nor are they in the language of the statute itself. "Public information" probably refers to an official, authorized disclosure, such as in court or in a public record. "Common knowledge" may mean enough people know the contents of the communication that further diminishment of the victim's privacy is negligible. This situation would include an instance in which a newspaper or other media outlet has already revealed the contents of a communication; further dissemination would not be a violation.

**Possession**

It is illegal to possess a device if one knows or has reason to know that its design makes it "primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." A police scanner that scans public radio frequencies as well as cellular frequencies is not generally considered an illegal device, but a scanner that scans only the cellular frequencies would be considered "primarily useful" for unlawful purposes. Illegal devices will be seized and forfeited, and violators will be fined according to the statute's general terms, imprisoned for up to five years or both.

**Criminal and civil penalties**

A violation of the statute is punishable by a prison

term of up to five years, a fine of up to $250,000 for individuals and $500,000 for corporations or both. Interception of the radio portion of a cellular or cordless telephone communication is punishable by a fine of from $500 to $250,000, but not incarceration.

Anyone whose communication is illegally intercepted, disclosed or used can sue for an injunction as well as to recover either actual damages plus any profits made by the violator or statutory damages, calculated at the rate of $100 per day of violation or $10,000, whichever is greater. Punitive damages, reasonable attorney's fees and court costs are also available.

A civil action must be brought within two years of the date the person had a reasonable opportunity to discover the violation.

*Discord Fahey 2005 (unincared) 2005 no cartoon*

## FCC rules

The Federal Communications Commission has adopted regulations that prohibit the use of certain transmitting devices, including wireless microphones, to overhear or record a "private conversation" unless authorized by all parties to the conversation. A "private conversation" is not one that takes place in a public or semipublic place.

Broadcast licensees are prohibited from recording a telephone conversation for broadcast without the consent of all parties. Notification must be given that the conversation will be broadcast before it can be broadcast live or taped. Consent may be presumed, however, as with callers to a talk-radio call-in program.

The FCC also restricts the recording of long-distance telephone calls. A call can be recorded if a beep tone is used, if all parties consent or if an announcement is made at the beginning of the call that it will be recorded. Enforcement of this regulation is the responsibility of telephone companies, and it is largely unenforced.

The FCC also prohibits broadcast stations from divulging the contents of police and fire department radio transmissions, although monitoring them is legal. It is legal to intercept and divulge a radio communication that is transmitted for the use of the general public and which relates to ships, aircraft, vehicles, or persons in distress or which is transmitted by an amateur radio station operator or by a citizens band radio operator.

Violation of these provisions may result in forfeitures, criminal fines and possible adverse action regarding a broadcaster's license.

*Fahey was discoverd 2005 by metropolitan police / DOJ. Repr confirmed Fahei was Acting Under the color of Law. Aided + Abetted by 25 year old Hispanic employed by her Aunt to jam williams Private Search to James T. Gni*



## GOVERNMENT OF THE DISTRICT OF COLUMBIA
## METROPOLITAN POLICE DEPARTMENT
### Security Officers Management Branch

January 11, 2005

Mrs. Yolanda C. Gibson-Michaels
1717 H Street Northwest  Room H-3081
Washington, D.C.  20001

Dear Mrs. Gibson-Michaels:

This letter will confirm your conversation on December 22, 2004, with Ms. Gray, staff member of the Security Officers Management Branch.  As previously stated, researching our files Mr. Douglass Fahey is not certified or pending certification through this branch as a Private Investigator.

It should also be noted that the Security Officers Management Branch has no jurisdiction on Federal contract sites.

If you have any additional questions or concerns, please feel free to contact a staff member on (202) 671-0500.

Sincerely,

Sergeant Peter C. McGrath
Assistant Branch Manager

(2) N514-6117 (Fax)

November 9, 2005


D.C. Wire Tap Office
Washington, D.C.

Re: **Expedited FOIA Request – Wire tap on Yolanda Gibson-Michaels**

In accordance to the Freedom of Information Act (FOIA), immediately upon request, provide a copy of:

(1) The wire tap court order secured by Douglas Fahey, contract investigator hired by the Federal Deposit Insurance Corporation (FDIC); contract by Securiguard on **April 14, 2004** and **April 15, 2004** to conduct a wire tap against Yolanda C. Gibson-Michaels on April 15, 2004.


(2) Provide a copy of all wire tap request by Douglas Fahey, contractor with securiguard for years 2003, 2004, and 2005.

(3) All copies of wire tap request by Federal Deposit Insurance Corporation against Yolanda C. Gibson-Michaels on April 14, 2004 and April 15, 2004.

(4) Provide a copy of sworn (affidavit) statement of Douglas Fahey before the U.S. Superior Court magistrate to conduct a wire tap against Yolanda Gibson-Michaels on April 14, 2004 and April 15, 2004.

(5) Provide a copy of sworn (affidavit) statement of an Federal Deposit Insurance Corporation (FDIC) official before the U.S. Superior Court magistrate to conduct a wire tap against Yolanda Gibson-Michaels on April 14, 2004 and April 15, 2004.


Send request to the attention of   Yolanda.Gibson-Michaels
                                    2210 Anvil Lane
                                    Temple Hills, Maryland 20748
                                    - 301) 650-5062



**U.S. Department of Justice**

Criminal Division

---

Office of Enforcement Operations                                    Washington, D.C. 20530

CRM-200501151P

Ms. Yolanda Gibson-Michaels                          DEC  3 2005
2210 Anvil Lane
Temple Hills, Maryland 20748

Dear Ms. Gibson-Michaels:

This is in response to your request of November 9, 2005, pursuant to the Privacy Act, for access to records concerning you and the wire tap request/order described in paragraphs 1-5 of your request.

We did not find any Criminal Division records within the scope of your request.

If you consider this response to be a denial of your request, you have a right to an administrative appeal of this determination. Department regulations provide that such appeals must be filed within sixty days of your receipt of this letter. 28 C.F.R. 16.45. Your appeal should be addressed to: Co-Director, Office of Information and Privacy, Flag Building, Suite 570, United States Department of Justice, Washington, D.C. 20530. Both the envelope and the letter should be clearly marked with the legend "FOIA Appeal." If you exercise this right and your appeal is denied, you also have the right to seek judicial review of this action in the federal judicial district (1) in which you reside, (2) in which you have your principal place of business, (3) in which the records denied are located, or (4) for the District of Columbia. If you elect to file an appeal, please include, in your letter to the Office of Information and Privacy, the Criminal Division file number that appears above your name in this letter.

Sincerely,

Thomas J. McIntyre
by KrS

Thomas J. McIntyre, Chief
Freedom of Information/Privacy Act Unit

JS-44
(Rev.1/05 DC)

## CIVIL COVER SHEET

### I (a) PLAINTIFFS

Yolanda C. Gibson-Michaels

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

PROSE N/P

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

### DEFENDANTS

Douglas A. Fahey, et al.,

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

CASE NUMBER  1:06CV01933

JUDGE:  Ricardo M. Urbina

DECK TYPE:  Civil Rights (non-employment)

DATE STAMP:  11/13/2006

### II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☒ 2 Federal Question
(U.S. Government Not a Party)

☒ U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES
FOR PLAINTIFF

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ☐ A. Antitrust | ☐ B. Personal Injury/ Malpractice | ☐ C. Administrative Agency Review | ☐ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br><br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

### ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ☐ **G. Habeas Corpus/ 2255**<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ **H. Employment Discrimination**<br><br>☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **I. FOIA/PRIVACY ACT**<br><br>☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **J. Student Loan**<br><br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ **K. Labor/ERISA (non-employment)**<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☒ **L. Other Civil Rights (non-employment)**<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ **M. Contract**<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ **N. Three-Judge Court**<br><br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**⊗ ORIGIN**

| ⊗ Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ Multi district Litigation | ☐ 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42 USC 1983

---

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS<br>☐    ACTION UNDER F.R.C.P. 23 | **DEMAND $**<br>0 | Check YES only if demanded in complaint<br>**JURY DEMAND:** ☐ YES  ⊗ NO |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    ☐ YES  ⊗ NO    If yes, please complete related case form.

**DATE** 11.13.06    **SIGNATURE OF ATTORNEY OF RECORD** NCD

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd